# UNITED STATES NATIONAL BANK OF OREGON *v.* INDEPENDENT INSURANCE AGENTS OF AMERICA, INC., ET AL.

No. 92–484.   Argued April 19, 1993—Decided June 7, 1993*

---

*Together with No. 92–507, *Ludwig, Comptroller of the Currency, et al.* v. *Independent Insurance Agents of America, Inc., et al.,* also on certiorari to the same court.

*Christopher J. Wright* argued the cause for petitioners in both cases and filed a brief for petitioners in No. 92–507. With him on the brief were *Acting Solicitor General Bryson, Assistant Attorney General Gerson, Deputy Solicitor General Wallace, Robert V. Zener, Jacob M. Lewis, William P. Bowden, Jr., Ernest C. Barrett III,* and *Lester N. Scall. Kenneth L. Bachman, Jr.,* and *Michael R. Lazerwitz* filed briefs for petitioner in No. 92–484.

*Ann M. Kappler* argued the cause for respondents in both cases. With her on the brief were *Donald B. Verrilli, Jr.,* and *Nory Miller.*†

JUSTICE SOUTER delivered the opinion of the Court.

The Comptroller of the Currency recently relied on a statutory provision enacted in 1916 to permit national banks located in small communities to sell insurance to customers outside those communities. These cases present the unlikely question whether Congress repealed that provision in 1918. We hold that no repeal occurred.

I

Almost 80 years ago, Congress authorized any national bank "doing business in any place the population of which does not exceed five thousand inhabitants . . . [to] act as the agent for any fire, life, or other insurance company." Act of Sept. 7, 1916, 39 Stat. 753. In the first compilation of the United States Code, this provision appeared as section 92 of Title 12. See 12 U. S. C. § 92 (1926 ed.); see also United States Code editions of 1934, 1940, and 1946. The 1952 edition of the Code, however, omitted the insurance provision, with a note indicating that Congress had repealed it

—————
†*John J. Gill III, Michael F. Crotty, Richard M. Whiting, Leonard J. Rubin,* and *John S. Jackson* filed a brief for the American Bankers Association et al. as *amici curiae* urging reversal.

in 1918.[1]  See 12 U. S. C. § 92 (1952 ed.) (note).  Though the provision has also been left out of the subsequent editions of the United States Code, including the current one (each containing in substance the same note that appeared in 1952, see United States Code editions of 1958, 1964, 1970, 1976, 1982, and 1988), the parties refer to it as "section 92," and so will we.

Despite the absence of section 92 from the Code, Congress has assumed that it remains in force, on one occasion actually amending it.  See Garn-St. Germain Depository Institutions Act of 1982, § 403(b), 96 Stat. 1511; see also Competitive Equality Banking Act of 1987, § 201(b)(5), 101 Stat. 583 (imposing a 1-year moratorium on section 92 activities).  The regulators concerned with the provision's subject, the Comptroller of the Currency and the Federal Reserve Board, have likewise acted on the understanding that section 92 remains

---

[1] The note states that "[t]he provisions of this section, which were added to R. S. § 5202 by act Sept. 7, 1916, ch. 461, 39 Stat. 753, were omitted in the amendment of R. S. § 5202 by act Apr. 5, 1918, ch. 45, § 20, 40 Stat. 512, and therefore this section has been omitted from the Code." 12 U. S. C. § 92 (1952 ed.) (note).  We do not know what prompted the 1952 codifiers to reverse the judgment of their predecessors.  The 1952 codifiers' decision, along with legislation that treated section 92 as valid law, apparently prompted a House of Representatives Committee to take a look at the status of section 92 in 1957.  See Financial Institutions Act of 1957: Hearings on S. 1451 and H. R. 7206 before the House Committee on Banking and Currency, 85th Cong., 2d Sess., pt. 2, pp. 989–990, 1010–1025, 1036–1040, 1060–1071 (1957).  After hearing conflicting testimony, the Committee took no action.  See id., at 1090, 1199.  Several years later, congressional staffers explored the issue again and concluded, with the codifiers, that Congress had repealed section 92 in 1918.  See Consolidation of Bank Examining and Supervisory Functions: Hearings on H. R. 107 and H. R. 6885 before the Subcommittee on Bank Supervision and Insurance of the House Committee on Banking and Currency, 89th Cong., 1st Sess., 391 (1965).  Though the conclusion was published in a House Subcommittee Report, see ibid., neither the Subcommittee nor full Committee took up the matter, and at no time has Congress attempted to reenact what staff thought had been repealed.

the law, see Brief for Federal Petitioners in No. 92–507, pp. 31–32; Brief for Petitioner in No. 92–484, pp. 26–28, and indeed it was a ruling by the Comptroller relying on section 92 that precipitated these cases.[2]

The ruling came on a request by United States National Bank of Oregon (Bank), a national bank with its principal place of business in Portland, Oregon, to sell insurance through its branch in Banks, Oregon (population: 489), to customers nationwide. The Comptroller approved the request in 1986, interpreting section 92 to permit national bank branches located in communities with populations not exceeding 5,000 to sell insurance to customers not only inside but also outside those communities. See App. to Pet. for Cert. in No. 92–507, pp. 74a–79a. The Bank is the petitioner in the first of the cases we decide today; the Comptroller of the Currency, the Office of the Comptroller of the Currency, and the United States are the petitioners in the other.

Respondents in both cases are various trade organizations representing insurance agents. They challenged the Comptroller's decision in the United States District Court for the District of Columbia, claiming the Comptroller's ruling to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" under the Administrative Procedure Act (APA), 5 U. S. C. § 706(2)(A). Respondents argued,

---

[2] Courts too, including this one, have assumed the validity of section 92. See *Commissioner* v. *First Security Bank of Utah, N. A.*, 405 U. S. 394, 401–402 (1972); *Independent Ins. Agents of Am., Inc.* v. *Board of Governors of Fed. Reserve System*, 266 U. S. App. D. C. 356, 360, n. 8, 835 F. 2d 1452, 1456, n. 8 (1987); *First National Bank of Lamarque* v. *Smith*, 610 F. 2d 1258, 1261, n. 6 (CA5 1980); *Commissioner* v. *Morris Trust*, 367 F. 2d 794, 795, n. 3 (CA4 1966); *Genessee Trustee Corp.* v. *Smith*, 102 F. 2d 125, 127 (CA6 1939); *Washington Agency, Inc.* v. *Forbes*, 309 Mich. 683, 684–686, 16 N. W. 2d 121, 121–122 (1944); *Marshall Nat. Bank & Trust Co.* v. *Corder*, 169 Va. 606, 609, 194 S. E. 734, 736 (1938); *Greene* v. *First National Bank of Thief River Falls*, 172 Minn. 310, 311–312, 215 N. W. 213, 213 (1927). But no court squarely addressed the question until the Court of Appeals below.

among other things, that the ruling was inconsistent with section 92, which respondents maintained permits national banks located in small communities to sell insurance only to customers in those communities. The District Court disagreed and granted summary judgment for the federal parties and the Bank, a defendant-intervenor, on the ground that the Comptroller's interpretation was "rational and consistent with [section 92]." *National Assn. of Life Underwriters* v. *Clarke,* 736 F. Supp. 1162, 1173 (1990) (internal quotation marks and citation omitted). The District Court thought it "worth noting that this section no longer appears in the United States Code" as it "apparently was inadvertently repealed" in 1918; but because Congress, the Comptroller, and other courts have presumed its continuing validity, the court was content to assume that the provision exists "in proprio vigore," meaning, we take it, of its own force. *Id.,* at 1163, n. 2.

Respondents had not asked the District Court to rule that section 92 no longer existed, and they took the same tack before the Court of Appeals for the District of Columbia Circuit, merely noting in their opening brief that section 92 may have been repealed in 1918 and then stating that all the relevant players had assumed its validity. The Court of Appeals, nevertheless, directed the parties to be prepared to address the status of section 92 at oral argument, and after oral argument (at which respondents' counsel declined to argue that the provision was no longer in force) ordered supplemental briefing on the issue. In their supplemental brief, respondents urged the court to decide the question, but took no position on whether section 92 was valid law. The Court of Appeals did decide the issue, reversing the District Court's decision and remanding with instructions to enter judgment for respondents. The court found first that, though the parties had not on their own questioned the validity of section 92, the court had a "duty" to do so, *Independent*

*Ins. Agents of America, Inc.* v. *Clarke*, 293 U. S. App. D. C. 403, 406, 955 F. 2d 731, 734 (1992); and, second, that the relevant statutes, "traditionally construed," demonstrate that Congress repealed section 92 in 1918, *id.*, at 407, 955 F. 2d, at 735. Judge Silberman, dissenting, would have affirmed without addressing the validity of section 92, an issue he thought was not properly before the court. *Id.*, at 413–416, 955 F. 2d, at 741–744. The Court of Appeals denied respondents' suggestion for rehearing en banc, with several judges filing separate statements. See 296 U. S. App. D. C. 115, 965 F. 2d 1077 (1992).

The Bank and the federal parties separately petitioned for certiorari, both petitions presenting the question whether section 92 remains in force and the Bank presenting the additional question whether the Court of Appeals properly addressed the issue. Because of a conflict on the important question whether section 92 is valid law, see *American Land Title Assn.* v. *Clarke*, 968 F. 2d 150, 151–154 (CA2 1992), cert. pending, Nos. 92–482, 92–645, we granted the petitions. 506 U. S. 1032 (1992). We now reverse.

## II

Before turning to the status of section 92, we address the Bank's threshold question, whether the Court of Appeals erred in considering the issue at all. Respondents did not challenge the validity of section 92 before the District Court; they did not do so in their opening brief in the Court of Appeals or, despite the court's invitation, at oral argument. Not until the Court of Appeals ordered supplemental briefing on the status of section 92 did respondents even urge the court to resolve the issue, while still taking no position on the merits. The Bank contends that the Court of Appeals lacked the authority to consider whether section 92 remains the law and, alternatively, that it abused its discretion in doing so. There is no need to linger long over either argument.

"The exercise of judicial power under Art. III of the Constitution depends on the existence of a case or controversy," and "a federal court [lacks] the power to render advisory opinions." *Preiser* v. *Newkirk,* 422 U. S. 395, 401 (1975); see also *Flast* v. *Cohen,* 392 U. S. 83, 97 (1968). The Bank maintains that there was no case or controversy about the validity of section 92, and that in resolving the status of the provision the Court of Appeals violated the Article III prohibition against advisory opinions.

There is no doubt, however, that from the start respondents' suit was the "pursuance of an honest and actual antagonistic assertion of rights by one [party] against another," *Muskrat* v. *United States,* 219 U. S. 346, 359 (1911) (internal quotation marks and citation omitted), that "valuable legal rights . . . [would] be directly affected to a specific and substantial degree" by a decision on whether the Comptroller's ruling was proper and lawful, *Nashville, C. & St. L. R. Co.* v. *Wallace,* 288 U. S. 249, 262 (1933), and that the Court of Appeals therefore had before it a real case and controversy extending to that issue. Though the parties did not lock horns over the status of section 92, they did clash over whether the Comptroller properly relied on section 92 as authority for his ruling, and "[w]hen an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law," *Kamen* v. *Kemper Financial Services, Inc.,* 500 U. S. 90, 99 (1991), even where the proper construction is that a law does not govern because it is not in force. "The judicial Power" extends to cases "arising under . . . the Laws of the United States," Art. III, § 2, cl. 1, and a court properly asked to construe a law has the constitutional power to determine whether the law exists, cf. *Cohens* v. *Virginia,* 6 Wheat. 264, 405 (1821) ("[I]f, in any controversy depending in a court, the cause should depend on the validity of such a law, that would be a case arising under

the constitution, to which the judicial power of the United States would extend") (Marshall, C. J.). The contrary conclusion would permit litigants, by agreeing on the legal issue presented, to extract the opinion of a court on hypothetical Acts of Congress or dubious constitutional principles, an opinion that would be difficult to characterize as anything but advisory.

Nor did prudence oblige the Court of Appeals to treat the unasserted argument that section 92 had been repealed as having been waived. Respondents argued from the start, as we noted, that section 92 was not authority for the Comptroller's ruling, and a court may consider an issue "antecedent to . . . and ultimately dispositive of" the dispute before it, even an issue the parties fail to identify and brief. *Arcadia* v. *Ohio Power Co.*, 498 U. S. 73, 77 (1990); cf. *Cardinal Chemical Co.* v. *Morton Int'l, Inc., ante,* at 88–89, n. 9 (addressing a legal question as to which the parties agreed on the answer). The omission of section 92 from the United States Code, moreover, along with the codifiers' indication that the provision had been repealed, created honest doubt about whether section 92 existed as law, and a court "need not render judgment on the basis of a rule of law whose nonexistence is apparent on the face of things, simply because the parties agree upon it." *United States* v. *Burke,* 504 U. S. 229, 246 (1992) (SCALIA, J., concurring in judgment). While the Bank says that by initially accepting the widespread assumption that section 92 remains in force, respondents forfeited their right to have the Court of Appeals consider whether the law exists, "[t]here can be no estoppel in the way of ascertaining the existence of a law," *South Ottawa* v. *Perkins,* 94 U. S. 260, 267 (1877). In addressing the status of section 92, the Court of Appeals did not stray beyond its constitutional or prudential boundaries.

The Court of Appeals, accordingly, had discretion to consider the validity of section 92, and under the circumstances did not abuse it. The court was asked to determine under

the APA whether the Comptroller's ruling was in accordance with a statutory provision that the keepers of the United States Code had suggested was no longer in force, on appeal from a District Court justifying its reliance on the law by the logic that, despite its "inadverten[t] repea[l]," section 92 remained in effect of its own force. 736 F. Supp., at 1163, n. 2. After giving the parties ample opportunity to address the issue, the Court of Appeals acted without any impropriety in refusing to accept what in effect was a stipulation on a question of law. Cf. *Swift & Co.* v. *Hocking Valley R. Co.*, 243 U. S. 281, 289 (1917). We need not decide whether the Court of Appeals had, as it concluded, a "duty" to address the status of section 92 (which would imply error in declining to do so), for the court's decision to consider the issue was certainly no abuse of its discretion.

## III

### A

Though the appearance of a provision in the current edition of the United States Code is "prima facie" evidence that the provision has the force of law, 1 U. S. C. § 204(a), it is the Statutes at Large that provides the "legal evidence of laws," § 112, and despite its omission from the Code section 92 remains on the books if the Statutes at Large so dictates.[3] Cf. *United States* v. *Welden*, 377 U. S. 95, 98, n. 4 (1964); *Stephan* v. *United States*, 319 U. S. 423, 426 (1943) *(per curiam)*. The analysis that underlies our conclusion that section 92 is valid law calls for familiarity with several provisions appearing in the Statutes at Large. This section provides the necessary statutory background.

---

[3] When Congress has enacted a title of the Code as positive law (as it has done, for instance, with Title 11, the Bankruptcy Code, see § 101, 92 Stat. 2549), the text of the Code provides "legal evidence of the laws." 1 U. S. C. § 204(a). But Congress has not enacted as positive law Title 12, in which section 92 for a time appeared.

The background begins in 1863 and 1864, when the Civil War Congress enacted and then reenacted the National Bank Act, which launched the modern national banking system by providing for federal chartering of private commercial banks and empowering the newly created national banks to issue and accept a uniform national currency. Act of Feb. 25, 1863, ch. 58, 12 Stat. 665; Act of June 3, 1864, ch. 106, 13 Stat. 99; see E. Symons, Jr., & J. White, Banking Law 22–25 (3d ed. 1991); see also 12 U. S. C. § 38. In a section important for these cases, the National Bank Act set limits on the indebtedness of national banks, subject to certain exceptions. See § 42, 12 Stat. 677 (1863 Act); § 36, 13 Stat. 110 (1864 Act). Ten years later, Congress adopted the indebtedness provision again as part of the Revised Statutes of the United States, a massive revision, reorganization, and reenactment of all statutes in effect at the time, accompanied by a simultaneous repeal of all prior ones. Rev. Stat. §§ 1–5601 (1874); see also Dwan & Feidler, The Federal Statutes—Their History and Use, 22 Minn. L. Rev. 1008, 1012–1015 (1938).[4] Title 62 of the Revised Statutes, containing §§ 5133 through 5243, included the Nation's banking laws, and, with a few stylistic alterations, the National Bank Act's indebtedness provision became § 5202 of the Revised Statutes:

> SEC. 5202. No association shall at any time be indebted, or in any way liable, to an amount exceeding the amount of its capital stock at such time actually paid

[4] The 1874 edition of the Revised Statutes marked the last time Congress codified United States laws by reenacting all of them. An 1878 edition of the Revised Statutes updated the original Revised Statutes, but was not enacted as positive law. See Act of Mar. 9, 1878, ch. 26, 20 Stat. 27; Act of Mar. 2, 1877, ch. 82, 19 Stat. 268. In 1919, the House Committee on the Revision of the Laws of the United States began work on what eventually became the United States Code, the first edition of which was published in 1926. See 44 Stat., pt. 1; Dwan & Feidler, 22 Minn. L. Rev., at 1018–1021.

in and remaining undiminished by losses or otherwise, except on account of demands of the nature following:

First. Notes of circulation.

Second. Moneys deposited with or collected by the association.

Third. Bills of exchange or drafts drawn against money actually on deposit to the credit of the association, or due thereto.

Fourth. Liabilities to the stockholders of the association for dividends and reserved profits.[5]

In 1913 Congress amended Rev. Stat. § 5202 by adding a fifth exception to the indebtedness limit. The amendment was a detail of the Federal Reserve Act of 1913 (Federal Reserve Act or 1913 Act), which created Federal Reserve banks and the Federal Reserve Board and required the national banks formed pursuant to the National Bank Act to become members of the new Federal Reserve System. Federal Reserve Act, ch. 6, 38 Stat. 251; see P. Studenski & H. Krooss, Financial History of the United States 255–262 (2d ed. 1963). The amendment came in § 13 of the 1913 Act, the first five paragraphs of which set forth the powers of the new Federal Reserve banks, such as the authority to accept and discount various forms of notes and commercial paper, including those issued by national banks. Federal Reserve Act, § 13, 38 Stat. 263–264. This (subject to ellipsis) followed:

> Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows: No national banking association shall

---

[5] Because of the importance in these cases of the location of quotation marks, we depart from our ordinary style regarding block quotations and reproduce quotation marks only as they appear in the original materials. Here, for example, we have not opened and closed Rev. Stat. § 5202 with quotation marks because none appear in the Revised Statutes. See also n. 6, *infra.*

at any time be indebted, or in any way liable, to an amount exceeding the amount of its capital stock at such time actually paid in and remaining undiminished by losses or otherwise, except on account of demands of the nature following:

.    .    .    .    .

Fifth. Liabilities incurred under the provisions of the Federal Reserve Act.

38 Stat. 264. The next and final paragraph of § 13 authorized the Federal Reserve Board to issue regulations governing the rediscount by Federal Reserve banks of bills receivable and bills of exchange. *Ibid.*

In 1916, Congress enacted what became section 92. It did so as part of a statute that amended various sections of the Federal Reserve Act and that, in the view of respondents and the Court of Appeals, also amended Rev. Stat. § 5202. Act of Sept. 7, 1916, 39 Stat. 752 (1916 Act). Unlike the 1913 Act, the 1916 Act employed quotation marks, and those quotation marks proved critical to the Court of Appeals's finding that the 1916 Act placed section 92 in Rev. Stat. § 5202. After amending § 11 of the Federal Reserve Act, the 1916 Act provided, without quotation marks,

[t]hat section thirteen be, and is hereby, amended to read as follows:

*Ibid.* Then followed within quotation marks several paragraphs that track the first five paragraphs of § 13 of the 1913 Act, the modifications generally expanding the powers of Federal Reserve banks. After the quotation marks closed, this appeared:

Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows: "No national banking association shall at any time be indebted, or in any way liable, to an amount exceeding the amount of its capital stock at such time actually paid in and remaining undiminished by

losses or otherwise, except on account of demands of the nature following:

"First. Notes of circulation.

"Second. Moneys deposited with or collected by the association.

"Third. Bills of exchange or drafts drawn against money actually on deposit to the credit of the association, or due thereto.

"Fourth. Liabilities to the stockholders of the association for dividends and reserve profits.

"Fifth. Liabilities incurred under the provisions of the Federal reserve Act.

"The discount and rediscount and the purchase and sale by any Federal reserve bank of any bills receivable and of domestic and foreign bills of exchange, and of acceptances authorized by this Act, shall be subject to such restrictions, limitations, and regulations as may be imposed by the Federal Reserve Board.

"That in addition to the powers now vested by law in national banking associations organized under the laws of the United States any such association located and doing business in any place the population of which does not exceed five thousand inhabitants, as shown by the last preceding decennial census, may, under such rules and regulations as may be prescribed by the Comptroller of the Currency, act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which said bank is located to do business in said State . . . .

"Any member bank may accept drafts or bills of exchange drawn upon it having not more than three months' sight to run, exclusive of days of grace, drawn under regulations to be prescribed by the Federal Reserve Board by banks or bankers in foreign countries or dependencies or insular possessions of the United States for the purpose of furnishing dollar exchange as re-

quired by the usages of trade in the respective countries, dependencies, or insular possessions. Such drafts or bills may be acquired by Federal reserve banks in such amounts and subject to such regulations, restrictions, and limitations as may be prescribed by the Federal Reserve Board . . . ."

39 Stat. 753–754. The second-to-last paragraph just quoted is the first appearance of the provision eventually codified as 12 U. S. C. § 92. After the quotation marks closed, the 1916 Act went on to amend § 14 of the Federal Reserve Act, introducing the amendment with a phrase not surrounded by quotation marks and then placing the revised language of § 14 within quotation marks. 39 Stat. 754. The pattern was repeated for amendments of §§ 16, 24, and 25 of the Federal Reserve Act. *Id.*, at 754–756.

The final relevant statute is the War Finance Corporation Act, ch. 45, 40 Stat. 506 (1918 Act), which in § 20 amended Rev. Stat. § 5202 by, at least, adding a sixth exception to the indebtedness limit:

> SEC. 20. Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows:
>
> "SEC. 5202. No national banking association shall at any time be indebted, or in any way liable, to an amount exceeding the amount of its capital stock at such time actually paid in and remaining undiminished by losses or otherwise, except on account of demands of the nature following:
>
> .          .          .          .          .
>
> "Sixth. Liabilities incurred under the provisions of the War Finance Corporation Act."

40 Stat. 512.

### B

The argument that section 92 is no longer in force, adopted by the Court of Appeals and pressed here by respondents, is

simply stated: the 1916 Act placed section 92 in Rev. Stat. § 5202, and the 1918 Act eliminated all of Rev. Stat. § 5202 except the indebtedness provision (to which it added a sixth exception), thus repealing section 92. Our discussion begins with the first premise of that argument, and there it ends, for we conclude with petitioners that the 1916 Act placed section 92 not in Rev. Stat. § 5202 but in § 13 of the Federal Reserve Act; since the 1918 Act did not touch § 13, it did not affect, much less repeal, section 92.

A reader following the path of punctuation of the 1916 Act would no doubt arrive at the opposite conclusion, that the statute added section 92 to Rev. Stat. § 5202. The 1916 Act reads, without quotation marks, *Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows.*[6] 39 Stat. 753. That phrase is followed by a colon and then opening quotation marks; closing quotation marks do not appear until several paragraphs later, and the paragraph that was later codified as 12 U. S. C. § 92 is one of those within the opening and closing quotation marks. The unavoidable inference from familiar rules of punctuation is that the 1916 Act placed section 92 in Rev. Stat. § 5202.

A statute's plain meaning must be enforced, of course, and the meaning of a statute will typically heed the commands of its punctuation. But a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning. Along with punctuation, text consists of words living "a communal existence," in Judge Learned Hand's phrase, the meaning of each word informing the others and "all in their aggregate tak[ing] their purport from the setting in which they are used." *NLRB* v. *Federbush Co.,* 121 F. 2d 954, 957 (CA2

---

[6] Because the placement of quotation marks is crucial in these cases, the quotations in the text from the 1916 and 1913 Acts appear in italics so as not to introduce quotation marks absent from the Statutes at Large. See n. 5, *supra.*

1941). Over and over we have stressed that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States* v. *Heirs of Boisdoré*, 8 How. 113, 122 (1849) (quoted in more than a dozen cases, most recently *Dole* v. *Steelworkers*, 494 U. S. 26, 35 (1990)); see also *King* v. *St. Vincent's Hospital*, 502 U. S. 215, 221 (1991). No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning. Statutory construction "is a holistic endeavor," *United Savings Assn. of Texas* v. *Timbers of Inwood Forest Associates, Ltd.*, 484 U. S. 365, 371 (1988), and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.

Here, though the deployment of quotation marks in the 1916 Act points in one direction, all of the other evidence from the statute points the other way. It points so certainly, in our view, as to allow only the conclusion that the punctuation marks were misplaced and that the 1916 Act put section 92 not in Rev. Stat. § 5202 but in § 13 of the Federal Reserve Act.[7]

The first thing to notice, we think, is the 1916 Act's structure. The Act begins by stating *[t]hat the Act entitled*

---

[7] Contrary to respondents' argument, the *Marshall Field* doctrine does not preclude us from asking whether the statute means something other than what the punctuation dictates. The *Marshall Field* doctrine, indeed, is irrelevant to this case. In *Marshall Field & Co.* v. *Clark*, 143 U. S. 649, 672 (1892), the Court stated that a law consists of the "enrolled bill," signed in open session by the Speaker of the House of Representatives and the President of the Senate, see also 1 U. S. C. § 106, but there is no doubt in these cases that the 1916 Act as printed in the Statutes at Large is identical to the enrolled bill. The *Marshall Field* doctrine concerns "'the nature of the evidence' the Court [may] consider in determining whether a bill had actually passed Congress," *United States* v. *Munoz-Flores*, 495 U. S. 385, 391, n. 4 (1990) (quoting *Marshall Field, supra,* at 670); it places no limits on the evidence a court may consider in determining the meaning of a bill that has passed Congress.

*"Federal reserve Act," approved [1913], be, and is hereby, amended as follows.* 39 Stat. 752. It then contains what appear to be seven directory phrases not surrounded by quotation marks, each of which is followed by one or more paragraphs within opening and closing quotation marks. These are the seven phrases (the numbers and citations in brackets are ours):

[1] At the end of section eleven insert a new clause as follows:

"..." [39 Stat. 752]

[2] That section thirteen be, and is hereby, amended to read as follows:

"..." [39 Stat. 752]

[3] Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows:

"..."[8] [39 Stat. 753]

[4] That subsection (e) of section fourteen, be, and is hereby, amended to read as follows:

"..." [39 Stat. 754]

[5] That the second paragraph of section sixteen be, and is hereby, amended to read as follows:

"..." [39 Stat. 754]

[6] That section twenty-four be, and is hereby, amended to read as follows:

"..." [39 Stat. 754]

[7] That section twenty-five be, and is hereby, amended to read as follows:

"..." [39 Stat. 755]

The paragraph eventually codified as 12 U. S. C. § 92 is one of several inside the quotation marks that open after the

---

[8] That the text within quotation marks follows the third directory phrase immediately after a space, rather than after a paragraph break, is significant. See n. 9, *infra.*

third phrase, which "hereby amended" Rev. Stat. § 5202, and that close before the fourth, and the argument that the 1916 Act placed section 92 in Rev. Stat. § 5202 hinges on the assumption that the third phrase is a directory phrase like each of the others. But the structure of the Act supports another possibility, that the third phrase does not introduce a new amendment at all. Of the seven phrases, only the third does not in terms refer to a section of the Federal Reserve Act. Congress, to be sure, was free to take a detour from its work on the Federal Reserve Act to revise the Revised Statutes. But if Congress had taken that turn, one would expect some textual indication of the point where once its work on Rev. Stat. § 5202 was done it returned to revision of the Federal Reserve Act. None of the directory phrases that follow the phrase mentioning Rev. Stat. § 5202, however, refers back to the Federal Reserve Act. The failure of the fourth phrase, for example, to say something like "subsection (e) of section fourteen *of the Federal Reserve Act of 1913* is hereby amended" suggests that the Congress never veered from its original course, that the object of the 1916 Act was single-mindedly to revise sections of the Federal Reserve Act, and that amending the Revised Statutes was beyond the 1916 law's scope.

Further evidence that the 1916 Act amended only the Federal Reserve Act comes from the 1916 Act's title: *An Act To amend certain sections of the Act entitled "Federal reserve Act," approved December twenty-third, nineteen hundred and thirteen.* During this era the titles of statutes that revised pre-existing laws appear to have typically mentioned each of the laws they revised. See, *e. g.,* Act of Sept. 26, 1918, ch. 177, 40 Stat. 967 ("An Act to amend and reenact sections four, eleven, sixteen, nineteen, and twenty-two of the Act approved December twenty-third, nineteen hundred and thirteen, and known as the Federal reserve Act, and sections fifty-two hundred and eight and fifty-two hundred and nine, Revised Statutes"). Cf. ch. 6, 38 Stat. 251 ("Federal

Reserve Act"). Absent a comprehensive review it is impossible to know the extent of exceptions to this general rule, if any, and we would not cast aside the 1916 Act's punctuation based solely on the Act's title. Nevertheless, the omission of the Revised Statutes from the 1916 Act's title does provide supporting evidence for the inference from the Act's structure, that the Act did not amend Rev. Stat. § 5202. Cf. *INS v. National Center for Immigrants' Rights, Inc.*, 502 U. S. 183, 189 (1991) (titles within a statute "can aid in resolving an ambiguity in the legislation's text").

One must ask, however, why the 1916 Act stated that *Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows*, 39 Stat. 753, if it did not amend Rev. Stat. § 5202. The answer emerges from comparing the 1916 Act with the statute that all agree it did amend, the Federal Reserve Act of 1913, and noticing that the identical directory phrase appeared in § 13 of the 1913 Act, which did amend Rev. Stat. § 5202. As enacted in 1913, § 13 contained several paragraphs granting powers to Federal Reserve banks; it then included a paragraph amending Rev. Stat. § 5202 (by adding a fifth exception to the indebtedness limit for "[l]iabilities incurred under the provisions of the Federal Reserve Act"), a paragraph that began *Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows.* 38 Stat. 264. The 1916 Act, in the portion following the phrase introducing a revision of § 13 of the 1913 Act, proceeded in the same manner. It contained several paragraphs granting powers to Federal Reserve banks, paragraphs that are somewhat revised versions of the ones that appeared in the 1913 Act, followed by the phrase introducing an amendment to Rev. Stat. § 5202 and then the language of Rev. Stat. § 5202 as it appeared in the 1913 Act. The similarity of the language of the 1916 and 1913 Acts suggests that, in order to amend § 13 in 1916, Congress restated the 1913 version of § 13 in its entirety, revising the portion it

intended to change and leaving the rest unaltered, including the portion that had amended Rev. Stat. § 5202.[9]

In defending the Court of Appeals's contrary conclusion that the 1916 Act amended Rev. Stat. § 5202, respondents argue that any other reading would render meaningless the language in the 1916 Act that purports to amend that section of the Revised Statutes. But the 1916 Congress would have had good reason to carry forward that portion of the 1913 Act containing Rev. Stat. § 5202, even though in 1916 it did not intend to amend it any further. The 1916 Act revised § 13 of the 1913 Act by completely restating it with a mixture of old and new language (providing that § 13 is amended "to read as follows," 39 Stat. 752), and a failure to restate Rev. Stat. § 5202 with its 1913 amendment could have been taken to indicate its repeal.

The final and decisive evidence that the 1916 Act placed section 92 in § 13 of the, Federal Reserve Act rather than Rev. Stat. § 5202 is provided by the language and subject matter of section 92 and the paragraphs surrounding it, paragraphs within the same opening and closing quotation marks. In the paragraph preceding section 92, the 1916 Act granted the Federal Reserve Board authority to regulate the

> discount and rediscount and the purchase and sale by any Federal reserve bank of any bills receivable and of domestic and foreign bills of exchange, and of acceptances authorized by *this Act* . . . .

39 Stat. 753 (emphasis added). "[T]his Act" must mean the Federal Reserve Act, since it was § 13 of the Federal Re-

---

[9] A comparison of the layout of the two Acts supplies further support for the conclusion that the 1916 Act restated the 1913 Act in full, and did not newly amend Rev. Stat. § 5202. With one exception, a paragraph break separates each of the introductory phrases in the 1916 Act from the text that follows within quotation marks. The exception is the phrase mentioning Rev. Stat. § 5202, the text within quotation marks following on the same line after only a space. That, significantly, is precisely the layout of the amendment to Rev. Stat. § 5202 in § 13 of the 1913 Act.

serve Act that granted banks the authority to discount and rediscount. Use of "this Act" in the discount-and-rediscount paragraph is powerful proof that the 1916 Act placed that paragraph in the Act to which it necessarily refers, the Federal Reserve Act. That is crucial because section 92 travels together with the paragraphs that surround it; neither the language nor, certainly, the punctuation of the 1916 Act justifies separating them. Because the 1916 Act placed the paragraph preceding section 92 in § 13 of the Federal Reserve Act, it follows that the 1916 Act placed section 92 there too.

We are not persuaded by respondents' argument that the term "this Act" in the discount-and-rediscount paragraph is an antecedent reference to "the Federal reserve Act," which is mentioned in the prior paragraph (in the fifth exception clause of Rev. Stat. § 5202). 39 Stat. 753; see also 38 Stat. 264 (1913 Act). If respondents are right, then the 1916 Act may be read as placing the discount-and-rediscount paragraph (and section 92, which necessarily accompanies it) in Rev. Stat. § 5202. But while the antecedent interpretation is arguable as construing "this Act" in the discount-and-rediscount paragraph, that reading cannot attach to the other uses of "this Act" in the 1916 Act, see 39 Stat. 752, 753, 754, since none is within the vicinity of a reference to the Federal Reserve Act. Presumptively, " 'identical words used in different parts of the same act are intended to have the same meaning,'" *Commissioner* v. *Keystone Consol. Industries, Inc., ante,* at 159 (quoting *Atlantic Cleaners & Dyers, Inc.* v. *United States,* 286 U. S. 427, 433 (1932)), and since nothing rebuts that presumption here, we are of the view that each use of "this Act" in the 1916 Act refers to the Act in which the language is contained. Rather than aiding respondents, then, the single full reference to "the Federal reserve Act" in the portion of the 1916 Act that amended Rev. Stat. § 5202 cuts against them. The fact that it was not repeated in the next paragraph confirms that the statute's quotation of Rev. Stat. § 5202 had ended.

Finally, the subject matter of the discount-and-rediscount paragraph (located, again, within the same opening and closing quotation marks as section 92) confirms that the 1916 Act placed section 92 in the Federal Reserve Act. The discount-and-rediscount paragraph subjects certain powers of Federal Reserve banks to regulation by the Federal Reserve Board. The logic of locating this provision in the Federal Reserve Act is obvious, whereas there would have been no reason for Congress to place it in Rev. Stat. § 5202, which narrowly addressed the indebtedness of national banks, or even in the National Bank Act (from which Rev. Stat. § 5202 derived), which concerned not public Federal Reserve banks or the Federal Reserve Board, but private national banks. Similarly, the paragraph following section 92, which authorizes Federal Reserve banks to acquire foreign drafts or bills of exchange from member banks and subjects transactions involving foreign acceptances to Federal Reserve Board regulations, fits far more comfortably with § 13 of the Federal Reserve Act than with Rev. Stat. § 5202. While we do not disagree with respondents insofar as they assert that Congress could have placed section 92, granting powers of insurance agency to some national banks (and without mentioning Federal Reserve banks or the Federal Reserve Board), in Rev. Stat. § 5202, Congress could also reasonably have dealt with the insurance provision as part of the Federal Reserve Act, which Congress had before it for amendment in 1916. There is no need to break that tie, however, because there is no way around the conclusion that the 1916 Act placed section 92 in the same statutory location as it must have placed its neighbors, in § 13 of the Federal Reserve Act.[10]

---

[10] Respondents point out that it would not have been absurd for Congress to have amended Rev. Stat. § 5202 in the middle of the 1916 Act. We agree, and of course there is no dispute that Congress three years earlier amended Rev. Stat. § 5202 in the middle of the 1913 Act. Both drafting choices strike us as odd, though neither would be without plausible reason. The 1913 Congress might well have thought it convenient to

Against the overwhelming evidence from the structure, language, and subject matter of the 1916 Act there stands only the evidence from the Act's punctuation, too weak to trump the rest. In these unusual cases, we are convinced that the placement of the quotation marks in the 1916 Act was a simple scrivener's error, a mistake made by someone unfamiliar with the law's object and design. Courts, we have said, should "disregard the punctuation, or repunctuate, if need be, to render the true meaning of the statute." *Hammock* v. *Loan & Trust Co.*, 105 U. S. 77, 84–85 (1882) (internal quotation marks and citation omitted). The true meaning of the 1916 Act is clear beyond question, and so we repunctuate. The 1916 Act should be read as if closing quotation marks do not appear at the end of the paragraph before the phrase *Section fifty-two hundred and two of the Revised Statutes of the United States is hereby amended so as to read as follows,* 39 Stat. 753, and as if the opening quotation marks that immediately follow that phrase instead precede it. Accordingly, the 1916 Act placed within § 13 of the Federal Reserve Act each of the paragraphs between the phrases that introduce the amendments to §§ 13 and 14 of the Federal Reserve Act, including the paragraph that was later codified as 12 U. S. C. § 92. Because the 1918 Act did not amend the Federal Reserve Act, it did not repeal

---

add the exception from Rev. Stat. § 5202's indebtedness limit for "[l]iabilities incurred under the provisions of the Federal Reserve Act" immediately after the language in the Federal Reserve Act that could result in the liabilities of concern, language that authorized national banks to accept certain drafts and bills of exchange. 38 Stat. 264. And the 1916 Congress could conceivably have found it similarly convenient to amend Rev. Stat. § 5202, which appeared in the Act it was amending at the time. The point of our analysis, however, is not that Congress could not possibly have amended Rev. Stat. § 5202 in the middle of the 1916 Act, but that the best reading of the Act, despite the punctuation marks, is that Congress did something else.

section 92, despite the Court of Appeals's conclusion to the contrary.[11]

Section 92 remains in force, and the judgment of the Court of Appeals is therefore reversed. These cases are remanded for further proceedings consistent with this opinion.

*So ordered.*

---

[11] Because we conclude that the meaning of the 1916 Act is plain, and because respondents do not argue that the law's plain meaning is "demonstrably at odds with the intentions of its drafters," *Griffin* v. *Oceanic Contractors, Inc.,* 458 U. S. 564, 571 (1982), we need not consider the 1916 Act's legislative history. Nor need we consider, again because the statute's meaning is unambiguous, what if any weight to accord the longstanding assumption of both the Comptroller and the Federal Reserve Board that section 92 survived the 1918 amendment of Rev. Stat. §5202. See *Public Employees Retirement System of Ohio* v. *Betts,* 492 U. S. 158, 171 (1989).

We note finally, since respondents raise the point, that our remark in *Posadas* v. *National City Bank,* 296 U. S. 497, 502 (1936), that the 1916 Act "amends [sections of the Federal Reserve Act], and §5202 of the Revised Statutes" is obviously not controlling, coming as it did in an opinion that did not present the question we decide in these cases. Were we to consider our past remarks about the statutes we discuss here, we would also have to account for *Commissioner* v. *First Security Bank of Utah, N. A.,* 405 U. S., at 401–402, and n. 12, in which the Court treated section 92 as valid law, despite noting its absence from the United States Code. Neither case tells us anything helpful for resolving this one, though together they contain a valuable reminder about the need to distinguish an opinion's holding from its dicta.