Justice Souter,
with whom Justice Stevens, Justice Ginsburg, and Justice Alito join, concurring in part and dissenting in part.
I agree that the petition for writ of certiorari was timely, and join Part II of the Court’s opinion. I disagree, however, that the phrase “tax valuation” in the Organic Act of Guam, § 11, 64 Stat. 387, as amended, 48 U. S. C. § 1423a, refers unambiguously to assessed value. If I could not go beyond statutory text and the sources relied upon by the Court, a coin toss would be my only way to judgment. But I look to congressional purpose, which points to appraised value as the meaning of the term, leaving me in respectful dissent.
The words “tax valuation” can plausibly be read in either of the ways the parties suggest: as synonymous with assessed value (the way the attorney general and the Court read them), because it is the assessed value to which the tax rate is immediately applied, Guam Code Ann., Tit. 11, §§ 24102(f), 24103 (1996), or as meaning appraised value, because the appraisal is a “valuation” for “tax” purposes. The Court concedes that the term “tax valuation” has no eanoni *493 cal definition, ante, at 489,[1] and says that the term “valuation,” standing alone, means “‘[t]he estimated worth of a thing,’ ” ibid, (quoting Black’s Law Dictionary 1721 (4th ed. 1951); alteration in original). Though taking property’s “estimated worth” to be its “tax valuation” would make practical sense, the Court believes that construction would read the word “tax” out of the statute. I do not see the objection, though. Even if we say “valuation” means actual value, the word “tax” has a job to do, by specifying that the valuation in question be the valuation used for tax purposes, thus ruling out an appraisal made solely for the purpose of calculating the debt limitation, with its temptation to indulge in creative accounting when money is tight.[2] But as I said, seeing the legitimacy of this reading just leaves us with two textually plausible constructions.
I see no tie-breaker in comparing Guam’s debt limitation with those of other Territories. In each Territory mentioned by the parties, when Congress imposed a territorial debt limitation the assessed value was equal to the actual value of the property.[3] Thus the attorney general can stress *494 the significance of assessed value and argue that because the debt limitation in the other Territories was based on the assessed value, the same should be true for Guam. And the Governor can argue that because the debt limitation in the other Territories was based on the actual value, that should go for Guam, too. Nor is the tie to be broken by arguing that pegging the territorial debt limit to “tax valuation” suggests that this Territory was meant to be treated more conservatively than a limit turning on full value; the suggestion is balanced by the question (without any answer proposed to us), why Congress would have wished a more restrictive (or nominally more restrictive) regime for certain Territories.[4]
Comparing state practices is no help, either. The Court says that “States that depart from the majority approach” of linking debt limitations to assessed value “use clear language to do so,” ante, at 491, but in the preceding paragraph the majority recognizes that state courts “have understood ‘valuation/ standing alone, to mean the market or cash value of property,” ante, at 490. So it seems a stretch to suggest that state laws offer a clear rule that Congress may be pre *495 sumed to have understood as background; better to read the state cases as products of the specific wording of their particular limitations and the state history of property taxation. See, e. g., Phelps v. Minneapolis, 174 Minn. 509,511-514,219 N. W. 872,873-874 (1928) (relying on text of limitation, other related provisions, and history of property taxation); N. W. Halsey & Co. v. Belle Plaine, 128 Iowa 467, 470-474, 104 N. W. 494, 495-497 (1905) (same). It almost goes without saying that neither side has cited a state case involving language and background the same as Guam’s.
In sum, the congressional mind does not emerge from the words “tax valuation” or any settled construction of that phrase. Fortunately, though, the purpose of the legislation does point to a likely reading. The statute itself makes clear that what Congress meant to provide was a practical guarantee against crushing debt on the shoulders of future generations, and insolvency with the inevitable call for a bailout by Congress. See United States Nat. Bank of Ore. v. Independent Ins. Agents of America, Inc., 508 U. S. 439, 455 (1993) (“ ‘[L]ook to the [law’s]... object and policy’ ” (quoting United States v. Heirs of Boisdoré, 8 How. 113, 122 (1849))).
The attorney general claims that her reading is a better fit with these objectives because it ties the legislature’s ability to incur debt to its willingness to tax. But this is hardly so. Under the attorney general’s approach (now the Court’s), the Guam Legislature could double the debt limitation without increasing taxes by a single penny, simply by doubling the assessment rate and cutting the tax rate by half.[5]
Although it is arguable that tying the debt ceiling to the assessed value may to some vague degree enhance legislative accountability by requiring action to raise the debt eeil *496 ing as debt piles up, I know of no independent suggestion that the debt limit was designed to operate as a political discouragement, not as a hard cap. It would, after all, have been strange for Congress to set a debt cap to constrain the Guam Legislature, only to leave the limiting figure subject to easy manipulation by the legislature. While I know that actual valuation can be manipulated, too, manipulation of that figure could only be done by officials acting in bad faith and subject to an obvious political or judicial challenge. The Court’s approach, by contrast, gives the legislature a green light to subvert its own stated limit with a clear conscience.[6]
The more practical understanding of what must have been intended is a statute tying the debt limitation to Guam’s capacity to tax property. The actual, market value of property is the only economic index of Guam’s ability to collect property taxes to pay its bills,[7] the only figure under consideration that is fixed in the real world, and the only figure that provides a genuine limitation. This was the figure employed or required by Congress in each of the other Territories mentioned above, see n. 3, supra, and I presume that its practical significance was in Congress’s mind when it set the debt caps for each of them. I see no reason not to attribute the same practical assessment to Congress in this instance.
I would affirm.

 The phrase “tax valuation” had been used in debt limitations for other Territories, see ch. 34, 41 Stat. 1096 (Puerto Rico); ch. 203, 42 Stat. 599 (Philippines), but in each of those Territories the issue in this case was irrelevant because assessed and appraised values were equal. See infra this page and 494, and nn. 3-4.

 Though the Court finds the appraised value to be “a step removed from taxation,” ante, at 490, the connection of the appraised value to the tax ultimately imposed is direct enough. It is true that the tax computation requires multiplying the appraised value by two percentages (first 35 percent to get the assessed value, Guam Code Ann., Tit. 11, § 24102(f) (1996), and then the 0.25 percent tax rate, § 24103) while the assessed value must only be multiplied by a single percentage. But as a practical matter, tying the tax to the assessed value ties it to the appraised value: multiplying the appraised value by 0.0875 percent (35 percent times 0.25 percent) will give you the tax every time.

 48 U. S. C. § 1401a (“[A]ll taxes on real property in the Virgin Islands shall be computed on the basis of the actual value of such property”); Haw. Rev. Stat., ch. 98, § 1212 (1905), Lodging of Respondent (Doc. 2b) (“[A]ll *494 real property and all personal property within the Territory shall be subject to an annual tax of one per cent, upon the full cash value of the same”); An Act to Provide Revenue for the People of Porto Rico, and for Other Purposes, Tit. I, §8 (1901), reprinted in Acts and Resolves of the First Legislative Assembly of Porto Rico 47 (1901), Lodging of Respondent (Doc. 3) (“All taxable property shall be valued and assessed at its actual market value”); A Compilation of the Acts of the Philippine Commission, Tit. 10, ch. 56, § 336(a) (1908), Lodging of Respondent (Doc. 4) (“[T]he board shall proceed to assess the value of each separate parcel of real estate and the improvements thereon, if any, at their true value in money”).

 The percentage of the valuation at which the various debt limitations were set likewise provides no basis for inferring that Congress had different intentions for different Territories. When the Organic Act of Guam was passed in 1950, each of the debt limitations in the Territories mentioned in n. 3, supra, was also set at 10 percent of the relevant valuation. See 48 U. S. C. § 1403 (Virgin Islands); 42 Stat. 116 (Hawaii); ch. 34, 41 Stat. 1096 (Puerto Rico); ch. 203, 42 Stat. 599 (Philippines).

 The specter of mischief extends to an attempt to set the assessment rate above 100 percent. The Court contends that political or practical constraints would foreclose this maneuver. See ante, at 491. After today’s decision, I suppose we may find out.

 The attorney general’s position would be strengthened if the assessment rate appeared in the Organic Act itself, for then the legislature would lack the power to change it. This state of affairs would be analogous to an assessment rate appearing in a state constitution. See, e. g., Colo. Const., Art. X, §3(l)(b); La Const., Art. VII, § 18(B). But the Organic Act set no assessment rate, leaving that up to the Guam Legislature.

 It is not, of course, the only index of Guam’s capacity to pay its bills; income taxation is an obvious source of revenue, see 48 U. S. C. §§ 1421i(a)-(b) (authorizing Guam to collect income tax).