FILED
United States Court of Appeals
Tenth Circuit

December 9, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

SHAWN LLOYD HINCKLEY,

Defendant - Appellant.

No. 07-7107

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D.C. No. 07-CR-00018-RAW-001)**

---

Christopher Wilson, Assistant United States Attorney (Sheldon J. Sperling, United States Attorney, on the brief), Muskogee, Oklahoma, for Plaintiff - Appellee.

Robert Ridenour, Assistant Federal Public Defender (Julia L. O'Connell, Acting Federal Public Defender and Barry L. Derryberry, Research & Writing Specialist of the Office of the Federal Public Defender, on the brief), Tulsa, Oklahoma, for Defendant - Appellant.

---

Before **KELLY**, **McCONNELL**, and **GORSUCH**, Circuit Judges.

---

**KELLY**, Circuit Judge.

Defendant-Appellant Shawn Lloyd Hinckley appeals from his conviction for failing to register pursuant to the Sex Offender Registration and Notification Act ("SORNA"), 18 U.S.C. § 2250, enacted July 27, 2006. On appeal, he argues that (1) the indictment was constitutionally defective because it sought to prosecute him for behavior that predated SORNA's effective date; (2) the application of SORNA in his circumstances violates the Ex Post Facto Clause; (3) he was denied due process because he had no notice that he was required to register under SORNA; (4) Congress's delegation to the Attorney General in § 16913(d) violates the Nondelegation Doctrine; and (5) SORNA violates the Commerce Clause by punishing activity that does not substantially affect interstate commerce. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

On October 19, 2000, Mr. Hinckley pled guilty to assault in the third degree with sexual motivation in Whatcom County, Washington. The plea arose out of allegations that he had forcible sex with his then live-in, but estranged, girlfriend who was six months' pregnant with twins. Mr. Hinckley received a sentence of sixty (60) days in jail and twelve (12) months of community supervision, and was informed of his obligation to register as a sex offender in Washington. He was later convicted in March 2004 for failure to register in

Washington State and received a sentence of three months. Upon his release on April 21, 2004, Mr. Hinckley registered as a sex offender in Washington.

In December 2005, Mr. Hinckley informed Washington authorities of his intention to move to Vian, Oklahoma, to live with his grandparents. Whatcom County authorities report that Mr. Hinckley was informed of his duty to register as a sex offender with the sheriff's office of the county to which he was moving in Oklahoma. On March 20, 2006, Mr. Hinckley applied for an Oklahoma Identification Card and signed an acknowledgment that he was required to register as a sex offender under Oklahoma law. In August 2006, Mr. Hinckley obtained employment with Mr. David Graham that required him to travel on a daily basis to Arkansas. Then, on January 24, 2007, Mr. Hinckley appeared at the Sallisaw Police Department to report a crime, and authorities discovered that Mr. Hinckley had not registered in Oklahoma. That same day, Mr. Hinckley registered as a sex offender at the Sequoyah County sheriff's office.

On March 14, 2007, federal authorities indicted Mr. Hinckley on one count of violating the Sex Offender Registration and Notification Act ("SORNA"), 18 U.S.C. § 2250. The indictment charged Mr. Hinckley in the Eastern District of Oklahoma as "an individual required to register . . . after becoming required to register, [with traveling] in interstate commerce, and . . . knowingly fail[ing] to register and update registration as required" during the period March 4, 2004, to January 24, 2007. On March 29, 2007, Mr. Hinckley filed a motion to dismiss the

-3-

indictment. The district court denied Mr. Hinckley's motion. Mr. Hinckley then entered a conditional plea of guilty, reserving his right to appeal the district court's order denying his motion to dismiss. In December 2007, the district court sentenced him to twenty-four (24) months' imprisonment and sixty (60) months' supervised release. Mr. Hinckley now appeals.

Discussion

The issues in this case involve statutory interpretations of and constitutional challenges to SORNA. We review such issues de novo, "'interpret[ing] the words of the statute in light of the purposes Congress sought to serve.'" Wright v. Fed. Bureau of Prisons, 451 F.3d 1231, 1233-34 (10th Cir. 2006) (quoting Hain v. Mullin, 436 F.3d 1168, 1176 (10th Cir. 2006) (en banc)); see also Bd. of County Comm'rs, Fremont County, Colorado v. U.S. E.E.O.C., 405 F.3d 840, 847 (10th Cir. 2005). We begin with the language of the statute and "read the words of the statute 'in their context and with a view to their place in the overall statutory scheme.'" Wright, 451 F.3d at 1234 (quoting Food and Drug Admin. v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33 (2000)).

A.    Applicability of SORNA

Mr. Hinckley argues that (1) his indictment is invalid because SORNA had not been enacted or implemented when he was alleged to have violated it; and (2)

he was not required to register under SORNA until February 28, 2007, when the

Attorney General issued an Interim Rule clarifying SORNA's retroactivity.  The

district court determined that "it is apparent from the plain language of the statute

that SORNA applies to [Mr. Hinckley]."  United States v. Hinckley, CR-07-18-

RAW (E.D. Okla. April 18, 2007) (Order denying Mr. Hinckley's motion to

dismiss the indictment).

SORNA provides, in pertinent part:

**(a) In general**
A sex offender shall register, and keep the registration current, in
each jurisdiction where the offender resides, where the offender is an
employee, and where the offender is a student.  For initial
registration purposes only, a sex offender shall also register in the
jurisdiction in which convicted if such jurisdiction is different from
the jurisdiction of residence.

**(b) Initial registration**
The sex offender shall initially register–
        (1) before completing a sentence of imprisonment with respect
        to the offense giving rise to the registration requirement; or
        (2) not later than 3 business days after being sentenced for that
        offense, if the sex offender is not sentenced to a term of
        imprisonment.

**(c) Keeping the registration current**
A sex offender shall, not later than 3 business days after each change
of name, residence, employment, or student status, appear in person
in at least 1 jurisdiction involved pursuant to subsection (a) of this
section and inform that jurisdiction of all changes in the information
required for that offender in the sex offender registry.  That
jurisdiction shall immediately provide that information to all other
jurisdictions in which the offender is required to register.

**(d) Initial registration of sex offenders unable to comply with
subsection (b) of this section**

The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b) of this section.

42 U.S.C. § 16913(a)-(d).

The Attorney General issued his Interim Rule on February 28, 2007, "making it indisputably clear that SORNA applies to all sex offenders (as the Act defines that term) regardless of when they were convicted." 72 Fed. Reg. 8894, 8896 (Feb. 28, 2007). The Rule states that "SORNA's direct federal law registration requirements for sex offenders are not subject to any deferral of effectiveness. They took effect when SORNA was enacted on July 27, 2006, and currently apply to all offenders in the categories for which SORNA requires registration." Id. at 8895.

The courts are split on the meaning of subsection (d), and whether sex offenders who failed to register during the "gap period" between SORNA's enactment and the Interim Rule have violated the registration requirements of subsection (a).[1] Because we find ambiguity in subsection (d), we look to the

_____

[1] Admittedly, the question presents a close call. The dissent argues that subsection (d) unambiguously authorizes the Attorney General to make SORNA retroactively applicable to past offenders in its first clause, and in its second clause gives the Attorney General the power to prescribe rules for past offenders and those offenders unable to comply with subsection (b)'s initial registration requirements. As discussed, we disagree, finding that subsection (d) presents a

(continued...)

-6-

provision's title and surrounding context, as well as the Act's history and purpose to determine its meaning. We find the reasoning of the Eighth Circuit in United States v. May, 535 F.3d 912 (8th Cir. 2008), persuasive and adopt it here. We hold that Mr. Hinckley violated SORNA by failing to register as a sex offender in Oklahoma after traveling in interstate commerce.

We begin with a brief discussion of the opposing interpretations of subsection (d) that courts have offered. To focus the discussion, we analyze the decisions of our sister circuits in United States v. Madera, 528 F.3d 852 (11th Cir. 2008) (per curiam), and May, 535 F.3d 912. While both cases involve a slightly different fact pattern than Mr. Hinckley's, their analysis is relevant. Madera involved a defendant who traveled in interstate commerce prior to SORNA's enactment in July 2006, and was arrested, prosecuted, and convicted prior to the Attorney General's issuance of the clarifying Interim Rule.[2] Madera, 528 F.3d at

---

[1](...continued)
statutory ambiguity, and can also reasonably be read to authorize the Attorney General merely to promulgate rules regarding initial registration requirements for those offenders unable to comply with subsection (b)'s requirements. Our interpretation of the statute is "not guided by a single sentence or member of a sentence, but [by] the provisions of the whole law, and . . . its object and policy." Dole v. United Steelworkers of Am., 494 U.S. 26, 35 (1990) (quoting Massachusetts v. Morash, 490 U.S. 107, 115 (1989)); see also Aulston v. United States, 915 F.2d 584, 589 (10th Cir. 1990) ("In interpreting the relevant language, however, we look to the provisions of the whole law, and to its object and policy."); United States v. Balint, 201 F.3d 928, 932-33 (7th Cir. 2000).

[2] In a related case, this court has held that SORNA does not apply to defendants who completed their interstate travel prior to SORNA's effective date
(continued...)

854. <u>May</u> is more analogous to the instant fact pattern, in that it involved a defendant who traveled in interstate commerce after SORNA's enactment in July 2006, failed to register in the new jurisdiction, and was arrested and convicted after promulgation of the Interim Rule. <u>May</u>, 535 F.3d at 915. The factual background now before us involves a defendant who traveled in interstate commerce after SORNA's enactment in July 2006, failed to register in the new jurisdiction until January 2007, and was arrested and convicted after promulgation of the Interim Rule.

In <u>Madera</u>, the court relied on the reasoning in <u>United States v. Kapp</u>, 487 F. Supp. 2d 536 (M.D. Pa. 2007), and concluded that subsection (d) comprises two separate clauses. "The first gives the Attorney General authority to determine whether SORNA applies retroactively to all sex offenders, and the second gives the Attorney General authority to promulgate rules regarding initial registration." <u>Madera</u>, 528 F.3d at 858. Essentially, the court reads subsection (d) as "contemplat[ing] two groups of sex offenders: (1) past offenders and (2) those unable to initially register under subsection (b)." <u>United States v. Beasley</u>, No. 1:07-CR-115-TCB, 2007 WL 3489999, at *5 (N.D. Ga. Oct. 10, 2007). The

---

[2](...continued)
of July 27, 2006. <u>See</u> <u>United States v. Husted</u>, No. 08-6010, 2008 WL 4792339 (10th Cir. Nov. 5, 2008). Because Mr. Hinckley's interstate travel occurred and continued after that date, unlike Mr. Husted's travel, he therefore satisfies both prongs of SORNA: the failure to register upon traveling in interstate commerce.

first clause, "'which addresses SORNA's applicability, only covers the first group: past offenders. Therefore, when the two clauses are read in conjunction, the first clause . . . unambiguously provides the Attorney General with authority to define the retrospective applicability of SORNA's registration requirements to past offenders.'" Id. (quoting Kapp, 487 F. Supp. 2d at 542). Under this interpretation, sex offenders convicted before July 27, 2006, cannot be held to violate SORNA for acts committed prior to the issuance of the Attorney General's Interim Rule on retroactivity. See United States v. Gill, 520 F. Supp. 2d 1341, 1349 (D. Utah 2007) (holding that SORNA did not apply to a defendant who failed to register in the interim period between enactment and issuance of the Interim Rule); United States v. Patterson, No. 8:07CR159, 2007 WL 2904099 (D. Neb. Sept. 21, 2007); United States v. Muzio, No. 4:07CR179, 2007 WL 2159462, at *5 (E.D. Mo. July 26, 2007) (finding "no ambiguity" in the statutory language).

The Madera court relied on the use of the word "shall" in subsection (d) as evidence that "Congress was issuing a directive to the Attorney General specifically to make the determination [of whether SORNA applied retroactively to those convicted prior to July 2006]." Madera, 528 F.3d at 857. In adopting this interpretation, the court rejected the argument urged by the government that subsection (d) "addresses only those offenders unable to comply with the timing requirements for initial registration under [subsection (b)]" and limits the

Attorney General's authority to promulgating rules pertaining to those sex offenders who are literally "unable to comply" with subsection (b)'s initial registration requirements due to the age of their convictions. Id. at 858; United States v. Roberts, No. 6:07-CR-70031, 2007 WL 2155750 (W.D. Va. July 27, 2007).

In May, the Eighth Circuit took the opposite position and found ambiguity in subsection (d). "Although the word 'shall' indicates a congressional directive, the question remains as to what § 16913(d) was specifically directing the Attorney General to regulate." May, 535 F.3d at 918. The May court held that a defendant who was registered under state law prior to the enactment of SORNA, and therefore not subject to the initial registration requirements in subsections (b) and (d), was required to register under SORNA according to subsection (a). See id. at 918-19 (quoting Roberts, 2007 WL 2155750, at *2); Beasley, 2007 WL 3489999, at *5; see also United States v. Hinen, 487 F. Supp. 2d 747, 750 (W.D. Va. 2007) (holding that the delegation in subsection (d) applies only to those offenders not required to register under any state law prior to SORNA's enactment); United States v. Templeton, No. CR-06-291-M, 2007 WL 445481, at *4 (W.D. Okla. Feb. 7, 2007) (failing to analyze the text of the statute for ambiguity, but holding that the title of subsection (d) indicates its reference to initial registration only).

In support, the May court relied on the analysis in Beasley, 2007 WL

3489999. In that case, the defendant traveled in interstate commerce in January 2007, failed to register in his new jurisdiction, and was arrested for violating SORNA on March 14, 2007, after issuance of the Interim Rule. The court concluded that subsection (d) was ambiguous "when considered in isolation and out of context," and stated that "[a]n additional possible meaning of subsection (d) is that past offenders . . . are included within (and not a separate group from) the broader category of 'sex offenders who are unable to comply with subsection (b),' and it is only as to those 'sex offenders who are unable to comply with subsection (b)' that the Attorney General was given authority under subsection (d) to issue clarifying regulations." Beasley, 2007 WL 3489999, at *6.

In agreement with Beasley, we also find it reasonable that the use of the word "other" to modify the phrase "categories of sex offenders who are unable to comply with subsection (d)" indicates that "offenders convicted prior to the law's enactment are one of the categories of offenders unable to comply with subsection (b)." Id. at *6 n.6. Such an interpretation leaves unaltered the ongoing registration requirements under subsections (a) and (c) imposed on all sex offenders. Furthermore, this interpretation does not affect those offenders who were required to register pre-SORNA under state law and therefore are excluded from SORNA's *initial* registration obligations in subsection (b) and any related rules promulgated with regard to initial registration under subsection (d). We agree with the Eighth Circuit's reading, finding that "the language of the statute is

-11-

broad enough to permit" the <u>Beasley</u> court's additional possible interpretation. <u>Zuni Pub. Sch. Dist. No. 89 v. Dept. of Educ.</u>, 127 S. Ct. 1534, 1546 (2007). Moreover, we find this interpretation more convincing than alternative interpretations in light of the Act's purpose and history. As the Interim Rule explained, "The SORNA reforms are generally designed to strengthen and increase the effectiveness of sex offender registration and notification for the protection of the public, and to eliminate potential gaps and loopholes under the pre-existing standards by means of which sex offenders could attempt to evade registration requirements or the consequences of registration violations." 72 Fed. Reg. at 8895. Reading subsection (d) to exclude all previously convicted sex offenders from SORNA's requirements would, as the Interim Rule explained, exempt "virtually the entire existing sex offender population." <u>Id.</u> at 8896. Such a result would directly contradict the Act's stated purpose of establishing "a comprehensive national system for the registration of [sex offenders and offenders against children]." 42 U.S.C. § 16901.[3]

"[S]tatutory '[a]mbiguity is a creature not [just] of definitional possibilities

_____

[3] "If SORNA were deemed inapplicable to sex offenders convicted prior to its enactment, then the resulting system for registration of sex offenders would be far from 'comprehensive,' and would not be effective in protecting the public from sex offenders because most sex offenders who are being released into the community or are now at large would be outside of its scope for years to come. For example, it would not apply to a sex offender convicted of a rape or child molestation offense in 2005, who is sentenced to imprisonment and released in 2020." 72 Fed. Reg. at 8896.

but [also] of statutory context.'" Id. at 1546 (quoting Brown v. Gardner, 513 U.S. 115, 118 (1994)) (citing Brown & Williamson, 529 U.S. at 132-33). We read a statute as "ambiguous" when it is "capable of being understood by reasonably well-informed persons in two or more different senses." McGraw v. Barnhart, 450 F.3d 493, 498 (10th Cir. 2006) (quoting United States v. Quarrell, 310 F.3d 664, 669 (10th Cir. 2002)). If the court finds the statute ambiguous, the court then looks beyond the plain text to resolve the ambiguity, examining legislative intent, overall statutory construction, and relevant subtitles.[4] See U.S. Nat'l Bank of Or. v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439 (1993) (examining the statutory background in addition to the statute's structure, title, and the language and subject matter of the section in question and the surrounding sections); Zuni Pub. Sch. Dist No. 89, 127 S. Ct. at 1541-42 (examining the statute's subject matter, history, and purpose). Because we see ambiguity in the statute, "[t]hat fact requires us to look beyond the language" to the construction of the statute, the context and subtitle of the subsection, and the Attorney General's Interim

_____

[4] If the ambiguity persists after consideration of the above factors, the Supreme Court requires the application of the rule of lenity. See Callanan v. U.S., 364 U.S. 587, 596 (1961) (directing the application of the rule of lenity "at the end of the process of construing what Congress has expressed, not at the beginning as an overriding consideration of being lenient to wrongdoers"). The rule of lenity directs the court to interpret a federal criminal statute in such fashion as to avoid an increase in the penalty prescribed for the offense. See Bifulco v. United States, 447 U.S. 381, 387-401 (1980) (determining that the rule of lenity need not apply after consideration of the language and structure, legislative history, and motivating policy of a statute).

Rule comments.  Zuni Pub. Sch. Dist. No. 89, 127 S. Ct. at 1546.

As in May, the government argues that subsection (d) refers only to initial registration requirements.  In support, the government relies on United States v. Zuniga, No. 4:07CR3156, 2008 WL 2184118, at *11-12 (D. Neb. May 23, 2008) (Memorandum and Order), which held that subsection (a), not subsection (d), made a defendant's obligation to register a federal requirement.  Finding ambiguity in subsection (d), the Zuniga court analyzed SORNA's overall statutory scheme and Congress's primary motivation in enacting it.  Not only did that court declare that subsection (a) "unambiguously requires" every sex offender to register, but it also found that "it was Congress's desire to create a comprehensive and uniform registration system among the states to ensure offenders could not evade requirements by simply moving from one state to another."  Id. at *10, *11 (quoting Hinen, 487 F. Supp. 2d at 752-53).  Any doubt as to subsection (d)'s limitations were removed when the Attorney General promulgated the Interim Rule as a "precautionary measure" only to clarify the retroactivity of SORNA, not to declare it retroactive.  May, 535 F.3d at 919.[5]  In addition, subsection (d)'s subheading, "Initial registration of sex offenders unable to comply with

_____

[5] The Interim Rule states: "The current rulemaking serves the narrower, immediately necessary purpose of foreclosing any dispute as to whether SORNA is applicable where the conviction for the predicate sex offense occurred prior to the enactment of SORNA."  72 Fed. Reg. at 8896.  The Rule goes on to state, "This rule forecloses such claims by making it indisputably clear that SORNA applies to all sex offenders . . . regardless of when they were convicted."  Id.

-14-

subsection (b) of this section," clearly limits it to the initial registration requirements in subsection (b).  We are also persuaded that the purpose of subsection (d) was not to exempt all sex offenders with convictions prior to July 2006 from SORNA's registration requirements, but rather to address then currently unregistered offenders with dated convictions that might not be able to comply with the initial registration requirements—three days after sentencing or prior to completion of the sentence.  Id.  These factors indicate that the statutory ambiguity should be resolved in favor of the Zuniga, Beasley, and May courts' interpretation, as it is the only sensible result in light of the Act's purpose, history, and surrounding language.

The dissent concludes that we must follow a "plain meaning" reading of the Act.  Given the obvious inconsistency among the subsection's subtitle, the statutory language, and the apparent breadth of the statute, we disagree.  We have never before read statutory language in such a vacuum.  In United States National Bank of Oregon v. Independent Insurance Agents of America, Inc., the Supreme Court rejected such a narrow "plain meaning" interpretation: "Over and over we have stressed that in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."  508 U.S. at 455 (internal quotation marks and alteration omitted); accord Brown & Williamson, 529 U.S. at 132 ("[A] reviewing court should not confine itself to examining a particular statutory provision in

-15-

isolation. The meaning–or ambiguity–of certain words or phrases may only become evident when placed in context."); United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction . . . is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (internal citations omitted)).

The plain language of subsection (d) is not nearly so clear as to unambiguously indicate that Congress intended to prohibit application of SORNA to all previously convicted sex offenders. Furthermore, when considered in context, it becomes clear that Congress did not intend to exempt all sex offenders convicted before July 27, 2006, from SORNA's requirements. Many sex offenders convicted before that date (those still incarcerated or awaiting sentencing) would be able to comply with subsection (b)'s initial registration requirement. There would be no reason for Congress to exempt such sex offenders. Congress was likely concerned with old convictions–offenders who had already served their sentences and never before had been required to register. As the Interim Rule explained, that group of sex offenders presents a logistical problem, one that Congress thought best to allow the Attorney General to resolve.

See 72 Fed. Reg. at 8896.[6] Subsection (d) accordingly gives the Attorney General the authority to decide whether these previously unregistered offenders will be required to register, and, if so, what the alternative timing rules will provide.

The dissent completely ignores subsection (d)'s title, which limits its scope to the "Initial registration of sex offenders unable to comply with subsection (b) of this section." Here, as in National Bank of Oregon, 508 U.S. at 458, subsection (d)'s title is "supporting evidence" for the inference that the Act's overall structure and purpose did not intend to exclude all previously convicted sex offenders from the Act's registration requirements. See also Carter v. United States, 530 U.S. 255, 277 n.2 (2000) (Ginsburg, J., dissenting) ("A statute's meaning can be elusive, and its title illuminating, even where a court cannot pinpoint a discrete word or phrase as the source of the ambiguity."); INS v. Nat'l Ctr. for Immigrants' Rights, Inc., 502 U.S. 183, 189 (1991) ("[T]he title of a statute or section can aid in resolving an ambiguity in the legislation's text.").

In sum, the dissent's conclusion is based on a single clause–"sex offenders

---

[6] Because sex offenders who have never before been required to register are not in the sex offender registry, tracking them down and notifying them of SORNA's requirements would require jurisdictions to go through old records and determine whether their convictions constitute sex offenses for the purposes of SORNA, and track them down and notify them of the new law. It makes sense that Congress would decide it best to allow the Attorney General to determine if and to what extent jurisdictions would be required to register sex offenders falling into this category. See generally Final Guidelines, 73 Fed. Reg. 38,030-01 (July 2, 2008).

convicted before July 27, 2006"–to the exclusion of all other portions of the statute and its purpose. We reject such a reading as contrary to the principles of statutory interpretation. See King v. St. Vincent's Hosp., 502 U.S. 215, 221 (1991) (following "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context" (internal citation omitted)); see also Nat'l Bank of Or., 508 U.S. at 454 ("[T]ext consists of words living a communal existence, . . . the meaning of each word informing the others and all in their aggregate taking their purport from the setting in which they are used." (internal quotation marks and alteration omitted)).

Mr. Hinckley was originally required to register under Washington and Oklahoma law prior to the enactment of SORNA. Because he had already registered, he is not subject to SORNA's initial registration requirements in subsections (b) or (d); consequently, there is no question regarding SORNA's applicability between July 2006 and the issuance of the Interim Rule.[7] While Mr. Hinckley's indictment, which encompasses dates spanning March 2004 through January 2007 may be overbroad,[8] his failure to register in Oklahoma prior to

---

[7] For the purposes of the case before us, we do not need to decide whether an individual who had never before been required to register would be required to register under subsection (d) before the Attorney General issued the Interim Rule.

[8] The Supreme Court has held that a conviction may be upheld as long as the indictment sets out the offense charged. "A part of the indictment unnecessary to and independent of the allegations of the offense proved may

(continued...)

-18-

January 2007, which was accompanied by his continued daily interstate travel to Arkansas, constitutes a violation of SORNA.

## B. Ex Post Facto Clause

Mr. Hinckley next argues that his prosecution under SORNA violates the Ex Post Facto Clause because it (1) punishes actions that occurred prior to SORNA's effective date and (2) increases punishment beyond what was in place at the time the crime was committed. In making this argument, he relies on Weaver v. Graham, which defined the ex post facto prohibition as barring Congress and the states from enacting "any law 'which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." 450 U.S. 24, 28 (1981) (quoting Cummings v. Missouri, 4 Wall. 277, 325-26 (1867)). Mr. Hinckley further relies upon Calder v. Bull, which prohibits under the Ex Post Facto Clause any law that criminalizes any action "*innocent* when done" or increases the punishment of a crime beyond the penalty in place at the time the crime was committed. Collins v. Youngblood, 497 U.S. 37, 42 (1990) (quoting Calder, 3 U.S. 386, 390 (1798)). Two elements must be satisfied to find that a law violates the Ex Post Facto Clause: (1) "it must be retrospective, that is, it must apply to events occurring

_____

[8](...continued)
normally be treated as 'a useless averment' that 'may be ignored.'" United States v. Miller, 471 U.S. 130, 136 (1985) (quoting Ford v. United States, 273 U.S. 593, 602 (1927)).

-19-

before its enactment," and (2) "it must disadvantage the offender affected by it." Weaver, 450 U.S. at 29 (citing Lindsey v. Washington, 301 U.S. 397, 401 (1937); Calder v. Bull, 3 U.S. at 390). In other words, Mr. Hinckley claims that (1) he is now being punished for conduct that occurred in 2004, which did not become a crime until 2006, and (2) the only laws in effect at the time of his offense were Oklahoma state statutes and the Jacob Wetterling Act, 42 U.S.C. § 14071, which carried lesser penalties than SORNA.

The district court did not address whether SORNA violates the Ex Post Facto Clause; however, we agree with the reasoning of the May court and hold that neither SORNA's registration requirements nor the criminal penalties attached to non-compliance in § 2250 violate the Ex Post Facto Clause. Relying on Smith v. Doe, 538 U.S. 84 (2003), as the government does, we find that the legislative intent expressed in SORNA's preamble and SORNA's primary effect satisfy the requirements of the Ex Post Facto Clause.

### 1. Punishment for Prior Acts

Mr. Hinckley first argues that his indictment for failure to register under § 2250 punishes him for acts committed prior to SORNA's effective date, and therefore violates the Ex Post Facto Clause. Because we view the failure to register as a continuing offense, we find no merit in Mr. Hinckley's claim.

The Supreme Court, in Toussie v. United States, 397 U.S. 112, 115 (1970), found that an offense is "continuing" when indicated by the "explicit language of

-20-

the substantive criminal statute," or when "the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." An interpretation of the sex offender registration requirement that defines it in any way other than as a continuing offense would result in absurdity. As the Western District of Virginia points out, "It would be illogical for members of Congress to express concern that thousands of sex offenders who were required to register under state law were evading those registration requirements and then exempt those same offenders from SORNA." Hinen, 487 F. Supp. 2d at 753.

Because subsection (d) applies only to initial registration issues, the application of SORNA to Mr. Hinckley does not violate the Ex Post Facto Clause. SORNA's failure to register provisions, 18 U.S.C. § 2250, impose registration requirements on any sex offender who "travels in interstate or foreign commerce" and "knowingly fails to register or update a registration as required by the Sex Offender Registration and Notification Act." Mr. Hinckley's indictment covers the time period spanning from SORNA's enactment in July 2006 up to the date he finally registered as a sex offender in Oklahoma as required by state and federal law on January 24, 2007. During this period, Mr. Hinckley continued to travel in interstate commerce daily between Oklahoma and Arkansas for work purposes. Therefore, Mr. Hinckley violated SORNA's registration requirements as outlined in 42 U.S.C. § 16913(a) and (c) by failing to keep his registration current in Oklahoma after a change of residence or employment, and the Ex Post Facto

-21-

Clause does not bar punishment.

   2.  Smith v. Doe

 Mr. Hinckley further challenges SORNA's overall applicability, arguing that the statute violates the Ex Post Facto Clause because it increases punishment retroactively.  In making this argument, Mr. Hinckley unsuccessfully attempts to distinguish the retroactive registration scheme at issue in Smith v. Doe, 538 U.S. 84, which the Supreme Court held did not violate the Ex Post Facto Clause.  Because we agree with the May court, which held that "a defendant, like [Mr. Hinckley], is not even subject to the Attorney General's regulation under § 16913(d)," we now analyze the statute's retroactive registration requirements under Smith and agree that they do not constitute an ex post facto violation.  May, 535 F.3d at 919.

 To determine whether the retroactive application of a statute violates the Ex Post Facto Clause, a court must decide whether the statute is civil or criminal in nature.  See id. (citing Kansas v. Hendricks, 521 U.S. 346, 361 (1997)).  The analysis requires an inquiry into the legislative intent, including the statute's manner of codification and its enforcement procedures, as well as the statute's effect.  See Smith, 538 U.S. at 93-106.  The Supreme Court has held that a legislative label of "civil" is insufficient to render a statute civil in nature, and the Court has stated that it will reject the "civil" label upon a showing of the "'clearest proof' that 'the statutory scheme [is] so punitive either in purpose or

effect as to negate [the State's] intention' to deem it 'civil.'" <u>Hendricks</u>, 521 U.S. at 361 (quoting <u>U.S. v. Ward</u>, 448 U.S. 242, 248-49 (1980)) (alteration in original).

Distinguishing <u>Smith</u>, Mr. Hinckley characterizes SORNA as a punitive criminal statute that violates the Ex Post Facto Clause. Unlike SORNA, he argues, the <u>Smith</u> scheme was primarily civil in nature, did not require Internet dissemination of offenders' information, did not establish a community notification program, did not require in-person reporting, and did not include felony criminal penalties. However, SORNA's declaration of purpose shapes the statute as one involving public safety concerns, making clear that the law is designed "to protect the public from sex offenders and offenders against children," and comes as a "response to the vicious attacks by violent predators." 42 U.S.C. § 16901; <u>see</u> <u>May</u>, 535 F.3d at 920; <u>Hinen</u>, 487 F. Supp. 2d at 755-56 (discussing the legislative intent behind SORNA); <u>Gill</u>, 520 F. Supp. 2d at 1348 (same). Therefore, the statute bears a legislative label of "civil."

To make our determination definitive, we must further explore whether such a "civil" statute is "'so punitive either in purpose or effect as to negate [Congress's] intention' to deem it 'civil.'" <u>Hendricks</u>, 521 U.S. at 361 (quoting <u>Ward</u>, 448 U.S. at 248-49); <u>see also</u> <u>May</u>, 535 F.3d at 919-20. SORNA clearly uses criminal penalties under 18 U.S.C. § 2250 to further its public safety ends, but "[i]nvoking the criminal process in aid of a statutory regime does not render

-23-

the statutory scheme itself punitive." Smith, 538 U.S. at 96. In addition, SORNA's codification of its failure to register provisions in the criminal code does not negate the fact that Congress codified the statute's general registration provisions under the heading of "public health and welfare." See id. at 94 ("The location and labels of a statutory provision do not by themselves transform a civil remedy into a criminal one."). Furthermore, SORNA, just as the Smith scheme, merely provides for the "dissemination of accurate information about a criminal record, most of which is already public." Id. at 98. While the public display of this information could result in shame for Mr. Hinckley, this is not "an integral part of the objective of the regulatory scheme." Id. at 99. SORNA aims to "inform the public for its own safety, not to humiliate the offender. Widespread public access is necessary for the efficacy of the scheme, and the attendant humiliation is but a collateral consequence of a valid regulation." Id. The statute's primary effect supports Congress's intention that it operate as a civil regulatory scheme designed to protect the general public welfare.

Ultimately, SORNA, a civil retroactive registration scheme, relies on criminal penalties to further its civil intent. It includes such penalties for the failure to register following interstate travel, thereby creating an entirely new offense imposed only upon violation of SORNA's registration requirements. Contrary to Mr. Hinckley's arguments, SORNA does not increase punishment for acts committed prior to SORNA's effective date. Therefore, the prosecution of

Mr. Hinckley under SORNA does not violate the Ex Post Facto Clause.

C.      Due Process

Mr. Hinckley next raises due process claims, arguing that the courts imposed SORNA's penalties without proper notice.  First, he contends that he could not have "knowingly" failed to register under SORNA because the government failed to inform him of his federal duty to register and of the greater penalty attached to SORNA violations.  Second, he argues that it was impossible to register in Oklahoma during the relevant time period because the state had not yet passed legislation implementing SORNA.  As in May, Mr. Hinckley's claim, "when boiled down to its essence, amounts to an 'ignorance of the law argument.'"  May, 535 F.3d at 921.  Accordingly, we find no due process violation.

In arguing that he had no notice of his obligation to register, Mr. Hinckley relies on United States v. Smith, 528 F. Supp. 2d 615 (S.D. W.Va. 2007).  In Smith, the district court held that, because the Attorney General did not promulgate the Interim Rule until February 2007, the government failed to provide the defendant adequate notice of his obligations.  Id. at 620.  However, the majority of courts have concluded that notice of a defendant's obligations under state law is sufficient to satisfy the Due Process Clause's requirements. See May, 535 F.3d at 921; see also United States v. Gould, 526 F. Supp. 2d 538,

at 545 n.8 (D. Md. 2007) (collecting cases).  We agree.  Moreover, Mr.

Hinckley's reliance on the Proposed Guidelines is misplaced.  The Guidelines

simply discuss examples of situations where states would need to provide

additional information on SORNA's requirements to offenders.  See Proposed

Guidelines, 72 Fed. Reg. 30,210, 30,228 (May 30, 2007) (discussing SORNA's

retroactivity); see also Gould, 526 F. Supp. 2d at 545.  In light of Mr. Hinckley's

conviction for failure to register in 2004 and his subsequent acknowledgment of

his duty to register in Oklahoma, we find that Mr. Hinckley had adequate notice

of his obligation to register as a sex offender.

Mr. Hinckley also contends that, while he may have had notice of his duty

to register, he did not have notice of the greater penalties SORNA carried.  He

relies on United States v. Barnes, No. 07 Cr. 187, 2007 WL 2119895, at *3

(S.D.N.Y. July 23, 2007), which held that notice of a state law having lesser

penalties differs from having actual notice of a much harsher federal law.

However, because Mr. Hinckley's arrest for this offense occurred well after

SORNA's enactment in July 2006, we presume that he was aware of the law.  See

Cheek v. United States, 498 U.S. 192, 199 (1991) ("The general rule that

ignorance of the law . . . is no defense to criminal prosecution is deeply rooted in

the American legal system."); see also Hinen, 487 F. Supp. 2d at 754 (holding

that sex offenders are on "constructive notice" that their registration obligations

may change periodically).  Any claim that his ignorance of the penalties for his

-26-

post-SORNA failure to register provides him with an affirmative defense is without merit.

Finally, Mr. Hinckley argues that Oklahoma had not yet statutorily implemented SORNA, thereby making registration in Oklahoma impossible. In support, he relies on Lambert v. California, 355 U.S. 225, 227 (1957), which held that a registration scheme violates due process if "applied to a person who has no actual knowledge of his duty to register, and where no showing is made of the probability of such knowledge." We find Lambert inapplicable because Mr. Hinckley, just like the defendant in May, did have knowledge of his duty to register under similar state and federal provisions. In addition, Mr. Hinckley claims that SORNA's Proposed Guidelines require states to pass implementing legislation, and that Oklahoma's failure to do so renders him "unable" to register in that state. On the contrary, the Guidelines state that, while SORNA does set "minimum standards for jurisdictions' registration and notification programs," it does not require statutory implementation. 72 Fed. Reg. at 30,213-14. The Guidelines continue on to state that the agency so delegated will assess the "totality of a jurisdiction's rules" to determine whether a state is in compliance with SORNA, and that a failure to properly implement SORNA results in "a 10% reduction of Federal justice assistance funding," not in an excuse for an offender who has failed to register. Id. at 30,212-13. Oklahoma clearly had a registration scheme in effect prior to Mr. Hinckley's arrest, Mr. Hinckley knew of his

-27-

obligation to register, and he failed to comply. He therefore not only had notice of his obligations but also could have registered in Oklahoma, which would have made him compliant with both state and federal law.

D.  Nondelegation Doctrine

Mr. Hinckley further argues that Congress violated the non-delegation doctrine by granting the Attorney General the power to determine SORNA's retroactivity under 42 U.S.C. § 16913(d). Because Mr. Hinckley is not an offender "unable to comply with [the initial registration requirements of] subsection (b)," we need not reach this argument. Subsection (d) does not apply to offenders who are required to and have already initially registered, and Mr. Hinckley therefore lacks standing to bring this claim. See May, 535 F.3d at 921 (citing United States v. Hays, 515 U.S. 737, 742-43 (1995) (discussing standing requirements)).

E.  Commerce Clause

Finally, Mr. Hinckley argues that SORNA violates the Commerce Clause. Specifically, he claims that the application of SORNA to his conduct is flawed, since his daily trips to Arkansas were not the type of conduct encompassed by "interstate travel," and that the failure to register as a sex offender has no substantial effect on interstate commerce. The Supreme Court has identified three areas that Congress may regulate under the Commerce Clause: (1) "the use of the

-28-

channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities"; and (3) "those activities that substantially affect interstate commerce." U.S. v. Lopez, 514 U.S. 549, 558 (1995); see also U.S. v. Morrison, 529 U.S. 598, 608-09 (2000).

Mr. Hinckley relies on Lopez and Morrison to support his claims. However, the statutes in those cases are easily distinguished from SORNA because they failed to include an interstate travel requirement and related only to purely intrastate activity, which falls under Lopez's third prong. The violation at issue here comprises two elements: post-SORNA failure to register coupled with interstate travel. Not only was Mr. Hinckley a "person . . . in interstate commerce," but he also used the channels of interstate commerce on a daily basis. Clearly, his travel across state lines to and from Oklahoma falls under the first or second of the Lopez prongs. Whether such an activity has a substantial effect on interstate commerce is irrelevant, since the first and second prongs of Lopez confirm Congress's authority to regulate this type of activity. See May, 535 F.3d at 921-22 (rejecting defendant's Commerce Clause arguments).

Essentially, "the Commerce Clause allows 'Congress to keep the channels of interstate commerce free from immoral and injurious uses.'" United States v. Patton, 451 F.3d 615, 621 (10th Cir. 2006) (quoting Heart of Atlanta Motel, Inc.

v. United States, 379 U.S. 241, 256 (1964)).  In enacting SORNA, Congress's aim was to create a uniform nationwide registration system to protect the public.  By requiring that a sex offender travel in interstate commerce before finding a registration violation, SORNA remains well within the constitutional boundaries of the Commerce Clause.  Because Mr. Hinckley failed to keep his registration current where he lived and failed to notify authorities of his change in employment status during the dates alleged, while also satisfying SORNA's jurisdictional requirement, we find that he has violated SORNA under 42 U.S. § 16913(a) and (c).

AFFIRMED.

07-7107, *United States v. Hinckley*

**GORSUCH,** J., Circuit Judge, concurring.

I am pleased to join Judge Kelly's thoughtful opinion for the court, and write only to add a few thoughts concerning the scope of SORNA's application.

When interpreting a statute, we begin with the words Congress has chosen. If, taking account of its context, that language is clear, our inquiry ends where it began, and we enforce the statute's plain meaning. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). But if an ambiguity lurks in the statute's wording, or if the statute's wording leads to irrational results, we are instructed by the Supreme Court to consult additional interpretive tools, including the statute's title, its history and purpose, and canons of construction, in an attempt to ascertain and give effect to Congress's meaning. *See, e.g., Exxon Mobil Corp. v. Allapattah Servs. Inc.*, 545 U.S. 546, 568 (2005); *Carter v. United States*, 530 U.S. 255, 267 (2000). Applying these instructions, I cannot help but conclude that the statute before us, 42 U.S.C. § 16913(d), is ambiguous, and that, after utilizing our traditional tools for resolving ambiguity, it is beyond question that Congress manifested an intent that SORNA should apply to Mr. Hinckley and others in his situation.

I

In deciding whether a statute is plain or ambiguous, we must ask whether it is "capable of being understood in two or more possible senses or ways" by a

reasonable and reasonably well-informed reader. *Chickasaw Nation v. United States*, 534 U.S. 84, 90 (2001). In answering this question, we must do so by examining not just "the language itself," but also "the specific context in which that language is used," as well as "the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. With that in mind, and because subsection (d) expressly references and interacts with subsection (b), I reprint both provisions:

(b)     Initial registration

The sex offender shall initially register –

(1) before completing a sentence of imprisonment with respect to the offense giving rise to the registration requirement; or

(2) not later than 3 business days after being sentenced for that offense, if the sex offender is not sentenced to a term of imprisonment.

* * *

(d)     Initial registration of sex offenders unable to comply with subsection (b) of this section[1]

The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such

---

[1]  To read the title of this subsection is to settle conclusively the debate over congressional intent. But we are instructed not to consider statutory titles unless ambiguity in the statute's meaning first appears, *Carter*, 530 U.S. at 267, so we will pretend for the moment that we did not see it.

sex offender and for other categories of sex offenders who are unable to comply with subsection (b) of this section.

It seems to me that a reasonable reader could find the language of subsection (d) susceptible to at least two interpretations. First, it might be read, as Mr. Hinckley, the dissent, and the Eleventh Circuit suggest, as containing two entirely independent commands: (i) SORNA will apply only to those convicted of sex offenses in the future, unless the Attorney General should happen to decide otherwise; and, (ii) the Attorney General is authorized to prescribe rules for the registration of certain sex offenders. *See* Dissent at 1-2; *United States v. Madera*, 528 F.3d 852 (11th Cir. 2008). Second, as the court and the Eighth Circuit suggest, subsection (d) might be read as embodying a single command: that the Attorney General shall determine the applicability of SORNA and adopt any necessary registration rules for those sex offenders unable to comply with the initial registration requirements of subsection (b). *See* Majority at 11; *United States v. May*, 535 F.3d 912, 918-19 (8th Cir. 2008). The fact that the first construction is not the only one a reasonable reader could reach is indicated by several features of the statute.

A

The first, and most narrow, such feature lies in the grammar of subsection (d) itself and the lack of clarity about what the phrase "who are unable to comply with subsection (b) of this section" actually modifies. In this respect, our statute

-3-

is like a veterinarian's advertisement promising to "perform surgery on any canine under 100 pounds, and provide necessary medication for any such canine and for other canines who are domestic pets."  A reasonable person *might* understand the first part of the advertisement as standing alone and offering operations on wild coyotes under 100 pounds.  But the use of the word "other" – a term that is often used to narrow the scope of terms that precede it – together with the modifying phrase "who are domestic pets" later in the advertisement suggests an additional and quite different possibility:  that the vet's promise to operate on canines under 100 pounds is restricted to pets, to Rover not Wile E. Coyote.  The reasonableness of such an interpretation may be enhanced and confirmed if the advertisement appears in the context of a neat suburban vet's office filled with poodles and lap cats rather than an animal rescue outpost near the wilderness.

So it is with our statute.  Because § 16913(d) provides that the Attorney General can specify the applicability of SORNA for those offenders convicted before July 27, 2006 and prescribe rules for those offenders and any other offenders unable to comply with subsection (b), it is at least *possible* to read the language to suggest that the Attorney General's power only extends to those offenders convicted before July 27, 2006, who are *also* unable to comply with subsection (b) – and not to *all* sex offenders convicted before July 27, 2006.  To be sure, statutory context, a point I will turn to shortly, may well shed light on the reasonableness of this reading, and help us ascertain whether an ambiguity exists.

-4-

But it is not an interpretation that can be necessarily and automatically excluded even by the isolated language of the statute.

To argue otherwise risks having us ignore the reality of ambiguity created by misplaced modifiers and similar grammatical sins in everyday English. Groucho Marx got laughs with his quip, "One morning I shot an elephant in my pajamas. How he got into my pajamas I'll never know," precisely because the most grammatical readings are not always the only reasonable ones. Context allows us to know that elephants rarely hide in pajamas and that another reading is at least reasonable and even much more likely. The Supreme Court has repeatedly instructed us that we must take account of just such possibilities in statutory construction, warning that an interpretation can be "literally permit[ted]" by a statute's grammar, "quite sensible as a matter of grammar," and even "the most natural grammatical reading" of the statute, without being the *only* reasonable interpretation, or even the reading most consistent with Congress's manifest intent. *See Chickasaw Nation*, 534 U.S. at 90; *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 68-69 (1994); *Nobleman v. Am. Savings Bank*, 508 U.S. 324, 330-331 (1993). After all, judges are not charged with grading Congress's grammar but with applying laws in conformance with Congress's manifest purpose.

The Court's decision in *X-Citement Video* highlights this fact. The statute at issue there covered any person who "knowingly transports or ships in interstate or foreign commerce by any means including by computer or mails, any visual depiction if (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and (B) such visual depiction is of such conduct." 513 U.S. at 68. The question presented to the Court was whether the word "knowingly" modified only the surrounding verbs (i.e., transports and ships) or whether it also modified the phrase "visual depiction involv[ing] the use of a minor engaging in sexually explicit conduct." Despite conceding that, under the most natural grammatical reading, "knowingly" would only modify the surrounding verbs, the Court explained that Congress could not have intended a result where the only required *mens rea* of a defendant was that he knew he used the mail, not that the package he mailed contained sexual images of minors. *Id.* at 69-70.

*X-Citement Video* shows that the possibility of misplaced modifiers is real and that grammatical heuristics can "assuredly be overcome by other indicia of meaning," *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Accordingly, when presented with a statute with a potential misplaced modifier or clause that might apply to more than just one antecedent, we must consult the surrounding context and structure before reflexively enforcing any construction of the statute. *See X-Citement Video*, 513 U.S. at 68; *Nobleman*, 508 U.S. at 331; *see also FDA v.*

-6-

*Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000) ("The meaning –

or ambiguity – of certain words or phrases may only become evident when placed

in context.").[2]

B

Mr. Hinckley (like the dissent) reads subsection (d) in isolation. But just as

context helps us ascertain an ambiguity lurking in the vet's and Marx's

statements, an examination of the context surrounding subsection (d) confirms

that Mr. Hinckley's interpretation of the statute is far from the only reasonable

one available. In SORNA, Congress expressly stated its intent to establish a

---

[2] An analogy advanced by the dissent serves to underscore the point. A statute applying to "humans and to other categories of primates who walk on two legs," Dissent at 5, surely could be read to suggest two distinct categories (humans and other primates who walk on two legs). But it is hardly beyond the linguistic pale to think that the modifying phrase "who walk on two legs" could restrict the term "humans" to those humans who walk on two legs. Of course, whether such a reading is reasonable could depend on the context of the statute as a whole, as *Robinson* instructs and Marx illustrates. Does other language in the statute indicate that Congress was regulating conduct that can only be performed by upright walkers? Or does such other language indicate Congress was regulating a subject more generally applicable to humans and two-legged primates? The plainness or ambiguity of a statute depends not just on the grammar of the single isolated sentence but, again, on "the context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341. Curiously, the dissent says it's easy to know my canine advertisement analogy doesn't cover coyotes because that would be an absurd result given the context. Dissent at 3, n.2. But the dissent doesn't proceed to explain why its own reading of the statute isn't subject to the same critique: it is no less implausible that Congress would give the Attorney General unfettered, unguided discretion to decide the scope of a criminal law in the context of an avowedly "comprehensive" regime. *See infra* Parts I.B &C.

-7-

"comprehensive" regime for the registration of sex offenders, *see* 42 U.S.C. § 16901, and virtually every feature of the Act evinces and seeks to further that design. Mr. Hinckley's interpretation of subsection (d) is irreconcilably at war with that stated purpose and its repeated manifestation throughout the Act, while the court's interpretation makes sense of and is in harmony with Congress's direction.

For example, Congress required states with preexisting sex offender registries to meet national standards and prodded states without registries to create them. *See* 42 U.S.C. §§ 16914(b); 16918; 16919(b); 16922; 16924. Elsewhere in the Act, Congress provided for the creation of a national sex offender registry for use by federal and state investigators nationwide; it also provided for the establishment of a public website allowing citizens to search for sex offenders by zip code. 42 U.S.C. §§ 16919 & 16920. Thus, in SORNA Congress sought to build on existing state registries and stitch them into a seamless national network, allowing governmental authorities and the public to access information on sex offenders nationwide.

Still other features of the statute confirm the comprehensive nature of the Act, and its effort to cover existing sex offenders. The term "sex offender" is defined as "an individual who *was* convicted of a sex offense." 42 U.S.C. § 16911(1) (emphasis added). The Act thus seems to envision the registry of existing sex offenders, not just those who are convicted after its enactment. And

-8-

§ 16913(a) directs all "sex offender[s]" to register and keep their registration current.  No distinction is made between those sex offenders with convictions that predate SORNA and those who are convicted after SORNA.  The same is true of § 16913(c), which directs all sex offenders to keep their registration current if they should change their name, residence, employment, or student status.  As the Eighth Circuit put it, "[t]he bulk of the statute does not make a distinction between those convicted before the Act and those convicted after.  It imposes its requirements on 'sex offenders' without qualification." *May*, 535 F.3d at 917 (quoting *Roberts*, 2007 WL 2155750, at *2).

Mr. Hinckley's reading of subsection (d) would undo Congress's express and repeatedly indicated purpose.  Absent some action by the Attorney General, those convicted before its enactment would *never* have to register.  Quite literally, a sex offender convicted one day before SORNA's enactment on July 26, 2006 of raping a child, and who thereafter serves twenty years' imprisonment, would have no obligation to register for the rest of his or her life, *even after* leaving prison in 2026.  Under Mr. Hinckley's reading, then, it might well be the late 21st century before all sex offenders must register.  The databases SORNA created for the public and law enforcement would sit idle, taking decades to be of any meaningful value.  Such a regime would be better described as cursory than comprehensive.

While Mr. Hinckley's interpretation does not make sense in light of the statute's context, the court's interpretation does. Prior to SORNA, some states did not have sex offender registration requirements as broad as SORNA's; others had no registries at all. As a result, some individuals who are classified as sex offenders under SORNA were not previously required or able to register under state law. *See United States v. Hinen*, 487 F.Supp.2d 747, 751-52 (W.D. Va. 2007). Aware that these individuals, through no fault of their own, could not *initially register* under subsection (b), which requires initial registration before an offender completes his or her prison sentence or 3 days after being sentenced to probation, Congress *had* to make provision for the registration of such sex offenders. The court's reading is entirely consistent with this necessity. It reads subsection (d) simply (but significantly) as authorizing the Attorney General to determine whether and how to provide for the registration of those sex offenders – not as suggesting a massive additional limitation on the Act's compass. As the court in *Roberts* explained, "it is clear from the context" of the statute as a whole "that [Congress's] intent was not to exempt all sex offenders convicted before July 2006 from registration requirements, but rather to avoid the obvious injustice of requiring such offenders to do the impossible of registering within 3 days of their years-old convictions." 2007 WL 2155750 at *2.[3]

---

[3] The dissent claims that its interpretation is neither "irrational [n]or counterproductive" because "SORNA's registration requirement applies to all sex

(continued...)

-10-

C

Finally, and related to the last point, ambiguity is suggested by the absurd results that Mr. Hinckley's reading produces. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004) (acknowledging that if plain meaning leads to absurd results, court may be required to treat the text as ambiguous).[4]

---

[3](...continued) offenders, whether their offense was committed before or after the effective date." Dissent at 3. This assertion is simply mistaken. Under the interpretation adopted by the dissent, the registration requirement of SORNA presumptively applies *only to future sex offenders*. It is merely if the Attorney General happens to choose, in his or her unfettered discretion and at some unspecified future time or in some future age, to rule otherwise that the Act has any application to existing sex offenders. For reasons I've given, such a construction of the statute is inconsistent with its manifest intent to create a comprehensive registration regime.

Alternatively, the dissent argues that interpreting the statute to exempt all past offenders is no more inconsistent with SORNA's comprehensive scheme than this court's holding in *United States v. Husted*, _ F.3d _, 2008 WL 4792339 (10th Cir. 2008), that a sex offender must travel in interstate commerce after SORNA's effective date to be criminally convicted of failing to register. This too is not so. The requirement that an offender travel in interstate commerce after the Act's effective date is plainly designed to ensure consistency with the Constitution – both with respect to Congress's power to legislate under the Commerce Clause as well as the prohibition against ex post facto laws. Congress desired SORNA to be both comprehensive *and* constitutional. *Husted* sensibly interprets one section of SORNA in conformity with those joint goals. In contrast, the dissent's interpretation of subsection (d) robs SORNA of its comprehensive nature.

[4] In fact, the Supreme Court has previously suggested that it will not interpret a statute to produce an absurd result even if the statute's language is *un*ambiguous. *See, e.g.*, *Hartford Underwriters Ins. Co. v. Union Planters Bank*, 530 U.S. 1, 6 (2000); *see also United States v. Brown*, 333 U.S. 18 (1948).

First and most obviously, Mr. Hinckley's reading of subsection (d) requires us to believe that Congress sought simultaneously to achieve two manifestly irreconcilable ends: (1) to create a "comprehensive national system" for the registration of sex offenders, 42 U.S.C. § 16901, and (2) to exempt all existing sex offenders from that comprehensive system. That makes nonsense of the word "comprehensive," unless Congress's purpose was to create a comprehensive registration regime for 22nd century sex offenders rather than those of our own time. Certainly, it is no less absurd to think Congress intended such a result than to surmise it wished, as in *X-Citement Video*, to criminalize the knowing use of the mails without requiring that the defendant have any knowledge that the item mailed contained child pornography.

Beyond that most glaring absurd result, other problems emerge under Mr. Hinckley's reading of § 16913(d) but not the court's interpretation. By way of example, under Mr. Hinckley's reading the Attorney General is given the power to specify whether SORNA applies and to prescribe registration rules for all past offenders, not just those unable to comply with subsection (b). *See* Dissent at 2. That is, the Attorney General is given the power to prescribe registration rules for, and even determine whether SORNA should apply to, past offenders who were already registered under SORNA-compliant state registration regimes before SORNA's passage and thus already automatically in compliance with the federal

Act.[5]  But why would the Attorney General be permitted or need to prescribe rules

for the registration of individuals already registered?  Or, even more oddly, to

decide, in his discretion, whether such individuals should be subject to the Act at

all?  Such a power would serve no obvious purpose, and is supported by no

conceivable justification.  Likewise, the Attorney General would have the same

extensive power for those past offenders – like Mr. Hinckley – who could have

initially registered before SORNA's passage through an existing SORNA-

complaint state registration system but who failed to do so.  Again, there is no

plausible need or reason to delegate to the Attorney General such authority with

respect to individuals who were perfectly capable of registering as required by

state law.[6]

---

[5]  *See United States v. Gagnon*, 574 F.Supp.2d 172, 176 (D. Me. 2008)
(explaining that because sex offender was already registered under state law when
SORNA was passed, his only obligation was to keep his registration current);
*United States v. Roberts*, 2007 WL 2155750, at *2 (W.D. Va. 2007) (same).

[6]  The Attorney General himself has discussed many of these problems and
likewise concluded that subsection (d) is ambiguous and best understood as
applying to all sex offenders even in the absence of any action by him.  *See
Applicability of the Sex Offender Registration and Notification Act*, 72 Fed. Reg.
8894, 8896.  Whether or not the Attorney General's determination is entitled to
deference in the quasi-criminal, quasi-regulatory context of assessing the scope of
the registration requirement, *see, e.g., Gonzales v. Oregon*, 546 U.S. 243, 258-59
(2006) (considering whether to afford deference to Attorney General's
classification of drugs used for assisted suicide, a classification that could lead to
criminal prosecutions), I need not resolve; it is notable in any event for its
persuasive force.  Of course, the Attorney General went on to promulgate an
interim rule stating that SORNA applies "to all sex offenders, including sex
offenders convicted of the offense for which registration is required prior to the
(continued...)

-13-

II

Given all of these problems – the uncertainty regarding the meaning of subsection (d) even when viewed in isolation, the outright conflict between Mr. Hinckley's preferred interpretation of that subsection and virtually every other facet of the Act, and the absurd results his interpretation compels – I cannot subscribe to the view that his interpretation is, plainly, the *only* reasonable reading of the Act. Because § 16913(d) is ambiguous, we are directed to employ traditional tools of statutory interpretation in an effort to discern Congress's meaning. Doing so readily and definitively resolves the ambiguity against Mr. Hinckley.

A

While precedent precludes reference to a statute's title when deciding whether the language of the statute itself is ambiguous, once ambiguity is found the title may be employed to shed light on Congress's intention. *Carter*, 530 U.S. at 267; *see also supra* n.1. Here, the title of § 16913(d) makes Congress's

---

[6](...continued)
enactment of that Act." 28 C.F.R. § 72.3. In *Madera*, the Eleventh Circuit found that this statement supported its conclusion that the Attorney General has the power to determine whether SORNA applied to those convicted before its enactment. 528 F.3d at 858. But I respectfully submit that the Eleventh Circuit drew the wrong conclusion. In addition to the fact that the Attorney General explicitly read the Act to apply to all sex offenders even in the absence of his action, the Attorney General also made clear that he was issuing the Interim Rule only to "foreclose" prior offenders from arguing that SORNA did not apply to them because the Attorney General had not acted. 72 Fed. Reg. 8894, 8896.

-14-

purpose blindingly clear. Section 16913(d) is titled "Initial registration of sex offenders unable to comply with subsection (b) of this section." This title's reference to sex offenders unable to comply with subsection (b) suggests that everything within the subsection concerns that limited group of offenders. All other sex offenders – those who were able to initially register under state law prior to SORNA, a group that includes Mr. Hinckley – are not covered by § 16913(d), and are unambiguously directed to register and keep their registration current under §§ 16913(a) and (c).

B

Lest any doubt remain, subsection (d)'s meaning is confirmed by the Act's structure and history. Without repeating the structural arguments in Part I.B *supra*, each underscores that Congress sought a comprehensive regime with meaningful application in today's world, not in some far distant age, and thus that the problem Congress sought to address in subsection (d) was how to handle the narrow issue of registration for those unable to initially register in compliance with § 16913(b). By contrast, nothing in the Act suggests that Congress sought to allow the Attorney General to decide whether or not the law would have comprehensive effect. Mr. Hinckley points to no such indicia in the Act's structure, and neither have we located any.

-15-

The Act's legislative history confirms the point.  Though the Supreme Court has recognized that legislative history is "often murky, ambiguous, and contradictory," *Exxon Mobil Corp.*, 545 U.S. at 568, the Court itself has repeatedly told us to employ such history when seeking to resolve an ambiguous text, *see, e.g.*, *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 508-09 (1989).  And, happily, the legislative history in this case is neither murky, ambiguous, nor contradictory.  While Judge Harold Leventhal famously once compared arguments from legislative history to "entering a crowded cocktail party and looking over the heads of the guests for one's friends," *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring), the legislative history before us is, in Judge Leventhal's vernacular, like a cocktail party where only friends are in attendance. That is, the bill's sponsors consistently and emphatically expressed displeasure with the existing state-by-state patchwork of sex offender laws and stated their intention to replace them with a uniform, comprehensive federal registration statute.  152 Cong. Rec. S8012, 8012-31 (July 20, 2006); 152 Cong. Rec. H5705, 5722-5731 (July 25, 2006).  The bill's sponsors also expressly sought for the new centralized regime to cover the approximately 500,000 sex offenders registered under various and patchwork state regimes at the time of the bill's enactment, as well as the estimated 100,000 entirely unregistered and unaccounted for

-16-

offenders.[7]  Given these statements, it beggars credulity to think that SORNA might have been intended by the authors of the legislation to exempt from registration *every* single sex offender at the time of its enactment.

C

Two additional factors counseling in favor of the interpretation of § 16913(d) offered by the court are the Supreme Court's teachings to avoid interpretations that produce absurd results or constitutional problems.  I've already explained and won't repeat here why Mr. Hinckley's interpretation risks the absurd result of converting a comprehensive regime into a cursory one.  *See supra* Part I.C.  But, I will pause briefly to discuss the potential constitutional difficulty raised by Mr. Hinckley's interpretation.

Article I of the Constitution vests legislative authority in Congress and "permits no delegation of those powers."  *Whitman v. Am. Trucking Assocs.*, 531 U.S. 457, 472 (2001).  That is why, when Congress delegates authority to the

---

[7]  Senator Biden said, "[T]here are over 550,000 offenders nationwide, and more than 20 percent of them are unaccounted for. . . .  [T]his means there are as many as 150,000 of these dangerous sex offenders out there, individuals who have already committed crimes and may, unless we do something, continue to jeopardize the most vulnerable among us."  152 Cong. Rec. S8012, 8014.  *See also* 152 Cong. Rec. H5705, 5722 (Rep. Sensenbrenner: "There are over a half million sex offenders in the United States and up to 100,000 offenders are unregistered and their locations [are] unknown to the public and law enforcement.").  Senator Hatch added that "[l]aws regarding registration for sex offenders have not been consistent from State to State[;] now all States will lock arms and present a unified front in the battle to protect children."  152 Cong. Rec. S8012, 8013 (daily ed. July 20, 2006).

-17-

executive branch, the Supreme Court requires it to provide "an intelligible principle to which the person or body authorized to [act] is directed to conform." *Id.* (quoting *J.W. Hampton Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). Under Mr. Hinckley's reading, however, the Attorney General has, as the Eleventh Circuit conceded, "*unfettered discretion* to determine both *how* and *whether* SORNA [is] to be retroactively applied." *Madera*, 528 F.3d at 858 (first emphasis added). Without any discernible principle to guide him or her in the statute, the Attorney General could, willy nilly, a) require every single one of the estimated half million sex offenders in the nation to register under SORNA, b) through inaction, leave each of those half million offenders exempt from SORNA, c) do anything in between those two extremes, or d) change his or her mind on this question, making the statute variously prospective and retroactive, as administrative agencies are normally entitled to do when Congress delegates interpretive questions to them, *see Nat'l Cable & Tel. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 1001 (2005). The Supreme Court tells us that we ought to construe statutes to avoid problems of potential constitutional dimension when a plausible alternative interpretation exists. *See Indus. Union Dept. AFL-CIO v. Amer. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (suggesting that statutes should be construed to avoid a "sweeping delegation of legislative power" that might be

unconstitutional).  And plainly a reasonable alternative exists in this case far more consonant with every indicator of congressional intent.[8]

* * *

Mr. Hinckley's interpretation is not without some grammatical appeal.  But neither is it the only parsing of subsection (d) a reasonable reader might make.  Nor are we permitted by the Supreme Court to interpret isolated statutory phrases solely according to grammatical diagrams.  We must take account of Congress's grammar to be sure, but the Court also requires us to take account of surrounding

---

[8]  Because, after consideration of the "text, structure, and history" of SORNA, "the Government's position is unambiguously correct," *United States v. Granderson*, 511 U.S. 39, 54 (1994), the rule of lenity has no application.  The rule of lenity applies only if, after "seizing every thing from which aid can be derived," *Smith v. United States*, 508 U.S. 223, 240 (1993) (quoting *United States v. Bass*, 404 U.S. 336, 347 (1971)), including the structure and history of the Act and relevant statutory titles, *United States v. Godin*, 534 F.3d 51, 60 (1st Cir. 2008); *United States v. Villanueva-Sotelo*, 515 F.3d 1234, 1247 (D.C. Cir. 2008); *United States v. Marek*, 238 F.3d 310, 322-23 (5th Cir. 2001), the statute remains ambiguous.  That isn't the case here.  Neither is the basic purpose of the lenity canon applicable.  Mr. Hinckley had "fair warning," *Bass*, 404 U.S. at 347-48, of his registration obligations because they are prescribed by state law, and SORNA did not expand them.  *See* Majority at 25-26.  The statutory canon against retroactivity likewise could not come into play, given the clarity of Congress's intent after consideration of the Act's context, structure, and history.  *See Landgraf v. USI Film Prods.*, 511 U.S. 244, 262-63 (1994) (examining legislative history to determine whether Congress clearly intended for statute to apply retroactively).  Indeed, it is highly unlikely that § 16913(d) could trigger the canon against retroactivity in any event.  While the statute applies to those with past convictions, it penalizes individuals only for prospective conduct – if they fail to register and travel in interstate commerce *after* the effective date of the Act.  *See Husted*, 2008 WL 4792339, at *7.

text, structure, and context.  Following these directions with respect to our interpretive role, I am convinced that SORNA applies to Mr. Hinckley.  I concur.

*United States v. Hinckley*, No. 07-7107

**McCONNELL**, J., dissenting.

The crucial question in this case is the interpretation of 42 U.S.C. § 16913(d), which the majority finds "ambiguous." I do not, and do not believe that there is an alternative reading of the language that permits us to affirm. § 16913(d) reads:

> The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction, and to prescribe rules for the registration of any such sex offenders and for other categories of sex offenders who are unable to comply with subsection (b) of this section.

The majority holds that the subchapter applied to prior offenders even before the Attorney General exercised his authority to specify whether it would do so, and thus presumably even if the Attorney General had never done so. This interpretation effectively writes the first clause of § 16913(d) out of the statute. That is not a tenable interpretation.

The section has two clauses. The first clause says, unambiguously, that the Attorney General has the authority to specify the requirements *of the subchapter*—all of SORNA[1]—to those who were convicted of a sex offense before the date of enactment (July 27, 2006), or its implementation in a particular

---

[1] SORNA is found in Title 42 of the United States Code. Chapter 151 of Title 42 concerns "Child Protection and Safety." Subchapter I of Title 42 is "Sex Offender Registration and Notification," i.e., SORNA.

jurisdiction. This clause provides that the Attorney General "shall" have the authority to "specify the applicability" of SORNA to past offenders. Until the Attorney General does so, the Act applies only prospectively, and does not apply to past offenders like Mr. Hinckley. As the district court explained in *United States v. Gill*, 520 F. Supp. 2d 1341, 1347 (D. Utah 2007):

> [Subsection (d)] unambiguously delegates authority to the Attorney General to determine SORNA's retroactive application—that is, in the words of the statute, the "applicability" of the registration requirement. Without such a determination from the Attorney General, the statute had no applicability to previously convicted sex offenders like [the defendant]

The second clause gives the Attorney General quite a different authority: to prescribe rules for the registration both of those whose offenses predate SORNA and also for "other categories of sex offenders" who, for whatever reason, are unable to comply with the initial registration requirements of SORNA. This clause also does not present any ambiguity. Whereas the Attorney General has the authority to "specify the applicability" of SORNA only as regards sex offenders who were convicted of their offense prior to SORNA's enactment, he can prescribe rules for the registration both of any pre-SORNA offenders *and* of other categories of sex offender (i.e., groups of offenders who committed their offense after enactment of SORNA) who meet the specified criterion, namely the inability to meet the initial registration requirements of subsection (b). Most of these, presumably, are offenders whose states did not have a SORNA-compliant

registration system in place at the time of their offense.  There is no grammatical reason to limit the category of pre-SORNA offenders to those who are unable to comply with subsection (b), for purposes of either clause.  Because there is no ambiguity, there is no need to look to the subtitle, the statutory purpose or context, or any other secondary interpretive aids.[2]

There is nothing irrational or counterproductive about this straightforward interpretation.  SORNA's registration requirement applies to all sex offenders, whether their offense was committed before or after the effective date.  But the criminal penalties of the Act are triggered by the offender's travel in interstate commerce.  18 U.S.C. § 2250(a)(1)(B).  This Court has held, and the majority does not dispute, that offenders who completed their travel in interstate commerce prior to July 27, 2006 face no criminal penalties for failure to register. *United States v. Husted*, ___ F.3d ___, 2008 WL 4792339 (Nov. 5, 2008).  We rejected

---

[2] Judge Gorsuch, in concurrence, relies heavily on an analogy involving dogs and coyotes.  Gorsuch concurrence, at 3.  The force of his analogy, however, arises entirely from the inherent unlikelihood that veterinarians would advertise to perform surgery on wild coyotes.  There is no such inherent implausibility in Congress investing the Attorney General with discretion to determine whether and how this statute should apply to prior offenders.  A precise analogy to the statute would be a veterinarian's advertisement promising to "perform surgery on canines under 100 pounds, and to provide necessary medication for any such canines and for other categories of canines who meet [certain specified qualifications]."  There is no ambiguity.  All canines under 100 pounds may receive both surgery and necessary medication; other categories of canine may receive medication only if they meet the specified qualifications.  There is no linguistic justification to limit surgeries on canines under 100 pounds to those who also meet the qualifications applicable to the "other categories" of canines.

the government's argument that it was absurd to interpret the statute in this limited way. Under the plain meaning of the statute, offenders like Mr. Hinckley, who completed their interstate travel during the seven months it took the Attorney General to issue regulations under § 16913(d), are in the same legal position as Mr. Husted. Not until they travel interstate after the effective date of the Act (which in their case is the date of the Attorney General's regulation) will they face criminal penalties for failure to register. The majority's argument that this limitation would exempt "virtually the entire existing sex offender population" and "would directly contradict the Act's stated purpose of establishing 'a comprehensive national system for the registration of [sex offenders and offenders against children],'" Maj. Op. 12 (internal citations omitted), is no more true here than it was in *Husted*. The Act applies to past offenders; the only practical effect of adopting the plain language interpretation is that offenders who traveled from one state to another after July 27, 2006 but before February 28, 2007, and have not traveled interstate since then, are treated the same way as those, like Mr. Husted, whose interstate travel was completed before July 27, 2006. If this seven months' gap matters as much as the majority asserts, the Attorney General should have issued his one-sentence regulation more quickly.

The majority follows the Eighth Circuit in *United States v. May*, 535 F.3d 912, 918 (8th Cir. 2008), which in turn adopted the reasoning of *United States v. Beasley*, No. 1:07-CR-115-TCB, 2007 WL 3489999 (N.D. Ga. Oct. 10, 2007).

-4-

The *Beasley* court began its analysis by purporting to find an ambiguity in the second clause of subsection (d). According to the *Beasley* court, it is linguistically possible to read the second clause of subsection (b) as providing that past offenders "are included within (and not a separate group from) the broader category of 'sex offenders who are unable to comply with subsection (b).'" *Id.* at *6. It then read this supposed ambiguity back into the first clause of subsection (b) and concluded that the Attorney General's authority to determine retroactivity applies only to past offenders who were unable to comply with the initial registration requirements at the time of their offense:

> An additional possible meaning of subsection (d) is that past offenders ("offenders convicted before the enactment of this Act") are included within (and not a separate group from) the broader category of "sex offenders who are unable to comply with subsection (b)," and it is only as to those "sex offenders who are unable to comply with subsection (b)" that the Attorney General was given authority under subsection (d) to issue clarifying regulations. In light of this ambiguity, the title of subsection (d) should be considered. Once the title is considered, the ambiguity in the one sentence text that follows the descriptive title is resolved, and it becomes clear that subsection (d) only applies to initial registration.

*Beasley*, 2007 WL 3489999, at *6 (footnotes and citations omitted).

The first problem with this analysis is that the second clause cannot plausibly be given this alternative reading. The second clause of subsection (b) states that the Attorney General's authority to prescribe rules for registration is applicable to "such offenders" (meaning past offenders) and "other categories of sex offenders" who are unable to comply with initial registration requirements.

"Other categories of sex offenders" plainly means types of sex offenders not encompassed within the former category, that is, those who are not past offenders. To read the statute as subsuming the set of past offenders into the set denominated "other categories of sex offenders" ignores the key term "other," which indicates that the two categories are distinct. It would be like interpreting a statute that applies to "humans and to other categories of primate who walk on two legs" as excluding paraplegic humans.

The second, and even more glaring, problem is that this interpretation produces a reading of the first part of subsection (b) flatly inconsistent with its language. In effect, the *Beasley* court has rewritten the first clause of subsection (d) to add two phrases to the statute which Congress did not place there. Those added phrases appear in brackets: "The Attorney General shall have the authority to specify the applicability of the requirements of **[subsection (b) of]** this subchapter to sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction **[only if they are unable to comply with subsection (b) of this section]**." In my opinion, neither of the bracketed additions is warranted or permitted by the statutory language. The first clause unmistakably gives the Attorney General authority to "specify the applicability of the requirements *of this subchapter*" to past offenders. The "subchapter" is the entirety of SORNA—not just the initial registration requirements. Similarly, because Congress explicitly required the Attorney General to determine the

-6-

applicability of the Act to "sex offenders convicted before July 27, 2006 or its implementation in a particular jurisdiction," courts may not limit that authority to the subset of prior offenders who were unable to comply with the initial registration requirements. Statutory interpretation involves discerning the meaning of the words used by Congress, not adding new words or limiting those Congress chose to use.

I conclude that there is no ambiguity in subsection (d), and the alternative reading proposed by the *Beasley* court and adopted by the majority is untenable. It follows that, because the Attorney General had not promulgated any rules about the retroactivity of SORNA prior to Mr. Hinckley's conviction, Mr. Hinckley did not violate its registration requirements. I therefore respectfully dissent.